603 F.2d 707
 CA 79-2797 The OGLALA SIOUX TRIBE OF INDIANS, and Elijah
Whirlwind Horse, President of the Oglala Sioux
Tribe of Indians
Anthony Whirlwind Horse, Appellant,
v.
Cecil D. ANDRUS, Secretary of the Interior, Forrest Gerard,
Assistant Secretary of the Interior, Indian Affairs, George
V. Goodwin, Deputy Assistant Secretary of the Interior,
Indian Affairs, Appellees.
The OGLALA SIOUX TRIBE OF INDIANS, Appellant, and Elijah
Whirlwind Horse, President of the Oglala Sioux
Tribe of Indians
v.
Cecil D. ANDRUS, Secretary of the Interior, Forrest Gerard,
Assistant Secretary of the Interior, Indian Affairs, George
V. Goodwin, Deputy Assistant Secretary of the Interior,
Indian Affairs, Appellees.
Anthony Whirlwind Horse, Plaintiff-Intervenor.
 Nos. 79-1029, 79-1116.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 19, 1979.
Decided July 27, 1979.
 
 Mario Gonzalez, Martin, S. D., for appellant, A. Whirlwind Horse.
 Marvin Amiotte, Oglala Sioux Tribal Legal Services, Pine Ridge Indian Reservation, Pine Ridge, S. D., for appellant, Oglala Sioux Tribe.
 Gail Osherenko, Atty., Land & Natural Resources Division, Appellate Section, U. S. Dept. of Justice, Washington, D. C. (argued), for appellees, James W. Moorman, Asst. Atty. Gen., Washington, D. C., Robert D. Hiaring, U. S. Atty., Jeffrey L. Viken and Shelley M. Stump, Asst. U. S. Attys., Sioux Falls, S. D., Steve Herman and Dirk D. Snel, Attys., and Anne Crichton, Atty., Dept. of the Interior, Washington, D. C., on brief.
 Joseph Little, Albuquerque, N. M., filed brief of amicus curiae, All Indian Pueblo Council, Inc.
 Before LAY, HEANEY and McMILLIAN, Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 The Oglala Sioux Tribe of Indians, Elijah Whirlwind Horse, President of the Tribe, and Anthony Whirlwind Horse, Superintendent of the Pine Ridge Agency of the Bureau of Indian Affairs (BIA), appeal from an order of the District Court which denied their request for permanent injunctive and declaratory relief, preventing the reassignment of Anthony Whirlwind Horse to the BIA's Area Office in Aberdeen, South Dakota. We reverse and remand.
 
 
 2
 Anthony Whirlwind Horse is an employee of BIA and has served as the Superintendent of the Bureau's Pine Ridge Agency since October 10, 1976. He was appointed to this position after BIA officials consulted with members of the Oglala Sioux Tribe, and after he was recommended for the position by a majority vote of the Oglala Sioux Tribal Council. As Superintendent of the Pine Ridge Agency, Anthony Whirlwind Horse is the highest-ranking official of the BIA located on the Reservation. He is the first full-blooded, Lakota-speaking person to hold this position. The District Court found, and the defendants do not dispute, that he has done an excellent job while serving in this capacity.
 
 
 3
 In early November, 1977, Elijah Whirlwind Horse, the brother of Anthony Whirlwind Horse, requested permission from the BIA to run for the office of Tribal President. At the time of this request, Elijah was employed by the Bureau as Principal of the Wanblee School which is located on the Reservation. Several days later, Albert Trimble, the then-President of the Tribe, wrote to Forrest Gerard, Assistant Secretary of the Interior, inquiring whether Elijah could maintain his status as a BIA employee and run for tribal office. Trimble was informed by the Bureau that an employee was not prohibited from seeking tribal office. John Combs, Chief of the Employee and Labor Relations Branch of the BIA, testified that after being informed of Elijah's inquiry, Bureau officials discussed whether Elijah's election to the office of Tribal President would create a conflict-of-interest situation as long as his brother held the post of Agency Superintendent. Neither brother was informed of the discussion.
 
 
 4
 Trimble again wrote to Assistant Secretary Gerard on November 21, 1977, raising the issue as to whether Anthony Whirlwind Horse could remain in his position of Agency Superintendent if his brother were elected. Bureau officials apparently did not answer Trimble's inquiry at that time. However, in late January, 1978, a telegram was sent from the Bureau's Washington, D. C., office to the Aberdeen Area Director, instructing him to begin considering what the Bureau should do in the event that Elijah Whirlwind Horse was elected.
 
 
 5
 Elijah Whirlwind Horse defeated Trimble in the election for the office of Tribal President in March, 1978. Rumors immediately began to circulate concerning the possible transfer of Anthony Whirlwind Horse to a position off the reservation. In response to these rumors, the Oglala Sioux Tribal Council overwhelmingly adopted a resolution supporting the retention of Anthony Whirlwind Horse on April 25, 1978.
 
 
 6
 On April 27, 1978, a staff employee of the Senate Select Committee on Indian Affairs sent a letter to the Bureau's Washington, D. C., office, inquiring as to whether an actual or apparent conflict of interest affected the two brothers in their respective posts. This letter was apparently prompted by an approach made by defeated candidate Trimble to members of Congress, and it requested that the BIA make its response directly to ex-President Trimble.
 
 
 7
 In view of the persistent rumors concerning the removal of Anthony Whirlwind Horse, the Oglala Sioux Tribal Council instructed two of its members, Melvin Cummings and Enos Poorbear, to meet with BIA officials in Washington. This meeting was held on May 10, 1978. At this meeting, the tribal delegates were informed that the Bureau was considering a transfer of Anthony Whirlwind Horse from his position as Superintendent of the Pine Ridge Agency because of a potential conflict of interest created by the election of his brother to the position of Tribal President, in violation of 43 C.F.R. § 20.735-32(d). Assistant Secretary Gerard acknowledged at trial that a decision to remove Anthony from the Superintendent's position had already been made prior to this meeting by Deputy Assistant Secretary of the Interior George Goodwin. On the day of the meeting, the Oglala Sioux Tribal Council unanimously passed a second resolution requesting the retention of Anthony Whirlwind Horse as Agency Superintendent. A third such resolution was passed by the Oglala Sioux Tribal Council on May 23, 1978.
 
 
 8
 On June 15, 1978, a letter was sent from the BIA's Washington office to Albert Trimble, informing him that the decision to remove Anthony Whirlwind Horse from his position as Agency Superintendent had been made. On the same day, instructions were issued by Deputy Assistant Secretary Goodwin to the area office in Aberdeen to arrange for Anthony's transfer. Anthony also received official notification of his transfer by a letter dated June 15, 1978.
 
 
 9
 On June 23, 1978, the Tribe appealed the BIA's decision to transfer Anthony Whirlwind Horse to the Secretary of the Interior. When no satisfaction was received, a tribal delegation traveled to Washington on July 7, 1978. After this delegation brought their complaint to White House officials and to the Office of the Secretary of the Interior, they were granted another meeting with Assistant Secretary Gerard. At that meeting, Gerard agreed to reconsider the transfer decision.
 
 
 10
 On August 24, 1978, Gerard reiterated his decision to remove Anthony Whirlwind Horse from the Superintendent's position. On August 25, 1978, the Area Director issued a memorandum to the Superintendent, confirming his reassignment. The decision of August 25, 1978, was considered to be a final agency action by the District Court.[1]
 
 
 11
 The Oglala Sioux Tribe and Elijah Whirlwind Horse, as President of the Tribe, filed a motion in federal District Court on September 21, 1978, seeking a temporary restraining order and a preliminary injunction against the transfer of Anthony Whirlwind Horse. The Tribe claimed that the pending reassignment violated its right to be consulted prior to the removal of an Agency Superintendent, as guaranteed by the provisions of a consultation policy adopted by the BIA on May 5, 1972, and by the provisions of the Indian Self-Determination Act, 25 U.S.C. § 450 Et seq. The Tribe also claimed that the decision to remove the incumbent Superintendent violated the Tribe's right to freely choose its elected officials, and was arbitrary, capricious and an abuse of the Agency's discretion, as set forth in the Administrative Procedure Act, 5 U.S.C. § 706.
 
 
 12
 The District Court treated the Tribe's motion as the filing of a formal complaint and, on September 25, 1978, it issued a temporary restraining order, prohibiting the transfer for ten days. The order was later extended by the court.
 
 
 13
 A motion to intervene was filed by Anthony Whirlwind Horse on October 5, 1978. An amended complaint in intervention was filed eleven days later. The District Court granted the motion to intervene, although it limited its consideration of the claims raised by the intervenor to those which were substantially the same as those previously raised by the Tribe.[2] Those claims alleged that the reassignment decision was not rationally based, and that it violated the spirit of the Indian Reorganization Act, 25 U.S.C. § 461 Et seq., and of the Indian Self-Determination Act, 25 U.S.C. § 450 Et seq.
 
 
 14
 Trial was held on November 21 and 22, 1978. In an order issued on December 29, 1978, the District Court concluded that the Bureau had not violated its consultation policy since that policy applies only to the initial selection and not to the transfer of an agency superintendent. The court concluded that the BIA has broad discretion under 5 C.F.R. § 335.102 to transfer its employees, and that its decision to transfer Anthony Whirlwind Horse on the basis of an apparent conflict of interest was not arbitrary, capricious or an abuse of discretion. The court found that although there have been no reported conflicts of interest between Anthony and Elijah Whirlwind Horse, the possibility for conflicts exists and the appearance of conflict is present. The court also concluded that although the election of Elijah Whirlwind Horse as Tribal President precipitated the Bureau's decision to transfer Anthony Whirlwind Horse from his position as Agency Superintendent, that decision did not constitute a violation of the Tribe's right to self-government because there was no direct interference with the Tribe's election of a President of its choice. The court specifically declined to consider several arguments raised by Anthony Whirlwind Horse in his post-trial brief on the ground that these issues were not before the court because they were not pleaded in the amended complaint in intervention nor previously raised in the lawsuit.[3]
 
 
 15
 On January 3, 1979, Anthony Whirlwind Horse moved for leave to amend his complaint in intervention to conform to the evidence presented at trial, pursuant to Fed.R.Civ.P. 15(b), and again requested that the court decide the legal issues raised in his post-trial brief. This motion was denied by the court on the basis that it was untimely.
 
 
 16
 Notice of appeal was filed by the Oglala Sioux Tribe and by Elijah Whirlwind Horse on January 4, 1979. Anthony Whirlwind Horse filed his notice of appeal one day later. The appellants' motion for an injunction pending appeal was granted by the District Court on January 5, 1979.[4] A motion by the All Indian Pueblo Council, Inc., a nonprofit organization composed of the nineteen Pueblos located in the state of New Mexico, for leave to file an Amicus curiae brief in support of the appellants was subsequently granted by this Court.
 
 I.
 
 17
 The government argues, as a threshold matter, that the appellants' suit for injunctive relief is premature since Anthony Whirlwind Horse has not exhausted his administrative remedies. It contends that appellants have not shown the kind of irreparable injury required by Sampson v. Murray, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), to permit injunctive relief pending a federal employee's exhaustion of administrative remedies.
 
 
 18
 We believe that Sampson is of limited applicability. In Sampson, a probationary Civil Service employee brought suit in federal district court, seeking to temporarily enjoin her dismissal pending her pursuit of an administrative appeal to the Civil Service Commission. The Court held that federal district courts are not totally without authority to grant interim injunctive relief in such cases, but that the plaintiff must make a showing of irreparable injury sufficient to overcome the traditional reluctance of federal courts to enjoin personnel actions by federal agencies. Sampson v. Murray, supra at 84, 94 S.Ct. 937. The Court noted that no witnesses were heard on the issue of irreparable injury and that the loss of earnings and damage to reputation, which would inure to Murray as the result of her discharge pending administrative appeal, were insufficient to constitute the kind of irreparable injury required for preliminary injunctive relief. Id. at 89-92, 94 S.Ct. 937.
 
 
 19
 The posture of the instant case is considerably different. Injunctive relief was initially sought not by Anthony Whirlwind Horse, the adversely affected government employee, but by the Tribe. The interests of the Tribe in maintaining the action were succinctly set forth by the District Court's order of November 1, 1978, denying the government's motion to dismiss:The Tribe has a strong interest in the position of BIA Superintendent on the Pine Ridge Indian Reservation. The Tribe has an interest in being assured that any relocation of a superintendent whom they recommended for the position and continue to support * * * not be arbitrary, capricious or the result of an abuse of discretion.
 
 
 20
 The Tribe also has a significant interest in self-determination. The election of Elijah Whirlwind Horse as president of the Oglala Sioux Tribe resulted in the BIA's decision to relocate Superintendent Anthony Whirlwind Horse because of the alleged violation of 43 C.F.R. § 20.735-32(d). Thus the Tribe's expression of (its) power to elect the candidate of (its) choice * * * caused the BIA to decide to relocate Anthony Whirlwind Horse. This result, which was highly undesirable from the Tribe's point-of-view, was thus an infringement on the Tribe's power of self-government.
 
 
 21
 The District Court also noted that while Anthony Whirlwind Horse, as an intervenor in the lawsuit, may not have exhausted his administrative remedies, the Tribe has exhausted its administrative remedies and has received a final agency decision on the matter. Indeed, the government did not contend below, and does not contend here, that any administrative avenues are available to the Tribe for any further challenge of the BIA's decision. Several witnesses testified at trial as to the abatement of prior violence and civil unrest on the reservation during the administration of Anthony Whirlwind Horse, and as to the likelihood of their reoccurrence if he were replaced while his case is administratively resolved. Combs conceded at trial that there is no administrative procedure which would allow Anthony Whirlwind Horse to obtain a stay of the order requiring his removal pending his exhaustion of administrative remedies; and when counsel attempted to obtain an estimate from Combs as to how long exhaustion of administrative remedies would take, counsel for the government objected and the objection was sustained. In light of all of these circumstances, we do not believe that the District Court's refusal to dismiss the Tribe's action, and its granting of Anthony Whirlwind Horse's motion to intervene in that action, were error.
 
 II.
 
 22
 We turn now to the merits of the case. The scope of judicial review of agency action has been set forth by the Supreme Court in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The reviewing court must first decide whether the agency acted within the scope of its statutory authority. Id. at 415, 91 S.Ct. 814. If it has, the court must then determine whether its actual choice was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."Id. at 416, 91 S.Ct. at 823, Quoting 5 U.S.C. § 706(2)(A). See CPC International Inc. v. Train, 515 F.2d 1032, 1043-1044 (8th Cir. 1975), Cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). The final inquiry is whether the agency followed the necessary procedural requirements. Citizens to Preserve Overton Park v. Volpe, supra, 401 U.S. at 417, 91 S.Ct. 814. During the course of this inquiry, the reviewing court must be satisfied that the agency not only employed procedures which conform to the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 551 Et seq., and § 701 Et seq., but which also conform to the agency's own internal procedures. Morton v. Ruiz, 415 U.S. 199, 235, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). This is true "even where the internal procedures are possibly more rigorous than otherwise would be required." Id. at 235, 94 S.Ct. at 1074. See United States v. Caceres, 440 U.S. 741, 751 n. 14, 99 S.Ct. 1465, 1471 n. 14, 59 L.Ed.2d 733, 743 n. 14 (1979).[5]
 
 
 23
 We agree with the appellants that the Bureau's decision to remove Anthony Whirlwind Horse from the position of Superintendent of the Pine Ridge Agency was "arbitrary, capricious * * * (and) otherwise not in accordance with law" because it was based on general Civil Service regulations, in violation of § 12 of the Indian Reorganization Act of 1934 (I.R.A.), 25 U.S.C. § 472. We also agree that the Bureau's action was procedurally defective in that it was not made in accordance with the Bureau's own procedure requiring prior consultation with the Tribe. We do not reach the appellants' alternative contentions.
 
 A.
 
 24
 The appellants first fully articulated the contention that the Bureau's reliance on Civil Service regulations in the removal of Anthony Whirlwind Horse contravened § 12 of the Indian Reorganization Act (I.R.A.),25 U.S.C. § 472, in a post-trial brief filed in the District Court. The District Court, in a memorandum which accompanied its final judgment, specifically declined to consider this contention on the ground that since it had not been pleaded in the amended complaint in intervention, or otherwise previously raised, it was not properly before the court. The government now contends that our consideration of this issue is likewise foreclosed. We disagree.[6]
 
 
 25
 The function of an affirmative federal pleading, under Fed.R.Civ.P. 8(a)(2), is to give the opposing party fair notice of the nature and basis or grounds for a claim, and a general indication of the type of litigation involved. 5 C. Wright & A. Miller, Federal Practice and Procedure § 1215 at 108-110 (1969). The "theory of the pleadings" doctrine, under which a plaintiff must succeed on those theories that are pleaded or not at all, has been effectively abolished under the federal rules. Id. § 1219 at 141-143. See also Bramlet v. Wilson, 495 F.2d 714, 716 (8th Cir. 1974). Indeed, under Fed.R.Civ.P. 54(c), except in the case of default, the "final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." As stated in C. Wright & A. Miller, Supra, "(t)he federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, * * * " provided that such a shift in the thrust of the case does not work to the prejudice of the opposing party. Id. § 1219 at 145 (footnote omitted). See Hail v. Heyman-Christiansen, Inc., 536 F.2d 908, 909 n. 2 (10th Cir. 1976); Janke Constr. Co., Inc. v. Vulcan Materials Co., 527 F.2d 772, 776 (7th Cir. 1976).
 
 
 26
 In his amended complaint in intervention, Anthony Whirlwind Horse alleged that the Bureau's decision to transfer him was not rationally based and that it violated the I.R.A. This allegation was certainly broad enough to put the Bureau on notice of appellants' claim that their use of the Civil Service regulations contravened the I.R.A. This claim was restated in greater detail, in substantially the same form as it is now presented to us, in his post-trial brief. The government, although arguing that this issue was not properly before the District Court, responded to it at that time. It has also responded to this allegation in detail in its brief before this Court. The government has not alleged any prejudice from our consideration of this issue, and since it is a purely legal issue which has been thoroughly briefed both before the District Court and before us, we can conceive of none. See Armstrong v. Collier, 536 F.2d 72, 77 (5th Cir. 1976); Finney v. Arkansas Bd. of Correction, 505 F.2d 194, 212 n. 16 (8th Cir. 1974). We will, therefore, proceed to the merits of this claim.
 
 
 27
 The Bureau has consistently cited two regulations as the authority for its removal of Anthony Whirlwind Horse from his position of Agency Superintendent.[7] The first regulation, 5 C.F.R. § 335.102 (1978), generally sets forth the powers of federal agencies to promote, demote, or reassign Civil Service employees.[8] The second regulation, 43 C.F.R. § 20.735-32(d) (1978), is a regulation promulgated by the Department of Interior, which sets forth certain actions which employees of the Department should avoid.[9] The government states that this regulation was primarily derived from Executive Order No. 11222, 30 Fed.Reg. 6469 (May 8, 1965), since that Executive Order authorized the promulgation by federal agencies of Civil Service regulations dealing with employees' conflicts of interest, 43 C.F.R. § 20.735-32(d) is also properly characterized as a Civil Service regulation.
 
 
 28
 The appellants contend that the Bureau's reliance on these general Civil Service regulations is contrary to § 12 of the Indian Reorganization Act of 1934 (I.R.A.), 25 U.S.C. § 472. This section provides:
 
 
 29
 The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed, Without regard to civil-service laws, to the various positions maintained, now or hereafter, by the Indian Office (of the Department of the Interior), in the administration of functions or services affecting any Indian Tribe. Such qualified Indians shall hereafter have the preference to appointment to vacancies in any such positions. (Emphasis added.)
 
 
 30
 The appellants contend that the utilization of Civil Service regulations by the Bureau to impose a per se conflict-of-interest disqualification on Indian employees because of their familial ties to tribal officials violates the clear mandate of § 12 that appointment of Indians to positions within the Bureau is to be made without regard to prevailing Civil Service laws.
 
 
 31
 It is beyond dispute that agency action taken without statutory authorization, or which frustrates the congressional policy which underlies a statute, is invalid. See FMC v. Seatrain Lines, Inc., 411 U.S. 726, 745-746, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); NLRB v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965). Assuming, arguendo, that the Civil Service regulations cited by the government require the transfer of Anthony Whirlwind Horse, we must determine whether those regulations provide sufficient authority for its action. If reliance upon those regulations is prohibited by § 12, the Bureau's action is void.
 
 
 32
 In order to determine whether the use of general Civil Service regulations is prohibited in this context, we must first delineate the scope and purpose of § 12. This section provides both that Indians are to be appointed to positions in the Indian service "without regard to civil-service laws," and that "(s) uch qualified Indians shall * * * have * * * preference" in the appointment to any vacancies. The purpose of § 12, and earlier Indian preference statutes, was to "actively and positively * * * establish, through an orderly process, Indian control of Indian services."[10] Freeman v. Morton, 162 U.S.App.D.C. 358, 363, 499 F.2d 494, 499 (1974). See also Mescalero Apache Tribe v. Hickel, 432 F.2d 956, 960 (10th Cir. 1970), Cert. denied, 401 U.S. 981, 91 S.Ct. 1195, 28 L.Ed.2d 333 (1971). Congress was aware that in order to increase the participation of tribal Indians in BIA operations, some kind of preference and exemption from otherwise prevailing Civil Service requirements was necessary. Morton v. Mancari, 417 U.S. 535, 543, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); Freeman v. Morton, supra, 162 U.S.App.D.C. at 363-364, 499 F.2d at 499-500. As stated by Congressman Howard, House sponsor of the I.R.A.:
 
 
 33
 The Indians have not only been thus deprived civic rights and powers, but they have been largely deprived of the opportunity to enter the more important positions in the service of the very bureau which manages their affairs. Theoretically, the Indians have the right to qualify for the Federal civil service. In actual practice there has been no adequate program of training to qualify Indians to compete in these examinations, especially for technical and higher positions; and even if there were such training, the Indians would have to compete under existing law, on equal terms with multitudes of white applicants. * * *
 
 
 34
 (Section 12) directs the Secretary of the Interior to establish the necessary standards of health, age, character, experience, knowledge and ability for Indian eligibles and to appoint them without regard to civil service laws. * * * This provision in no way signifies a disregard of the true merit system, but it adapts the merit system to Indian temperament, training and capacity.
 
 
 35
 78 Cong.Rec. 11729, 11731 (1934).
 
 
 36
 It is clear to us that the Bureau's use of Civil Service regulations to impose a per se disqualification upon many Indians who might otherwise be eligible to serve in the position of agency superintendent is precisely the kind of blind transference of general Civil Service principles to the particular context of Indian employment which § 12 explicitly forbids. Such a transference of general Civil Service conflict-of-interest regulations ignores the particular conditions which affect Indian employment on the reservation, and the impact which such regulations may have on the goal of increased Indian employment and responsibility in the decisionmaking positions within the BIA.[11]
 
 
 37
 By invalidating the Bureau's action in this case, we do not hold that the BIA or the Department of the Interior cannot formulate conflict-of-interest regulations governing the Bureau's Indian employees which would have the effect of disqualifying some reservation Indians from some positions within the BIA. We hold only that any such regulations must be consistent with the congressional policy embodied in § 12, and that the Bureau cannot, as was done here, rely upon general Civil Service regulations to accomplish that purpose.
 
 B.
 
 38
 The appellants' contention that the Bureau had failed to follow its own internal procedure requiring consultation with the Tribe prior to the reassignment of Anthony Whirlwind Horse is primarily based on a document entitled "Guidelines for Consultation with Tribal Groups on Personnel Management Within the Bureau of Indian Affairs."[12] A draft of these guidelines was first circulated by the Commissioner of Indian Affairs to all tribes on June 30, 1971. After a period for comment and discussion, the revised guidelines, now in effect, were circulated to all tribes on May 5, 1972. These guidelines state in pertinent part:
 
 
 39
 These guidelines * * * recognize the possible variations in scope and intensity of tribal consultation. It is incumbent on all Bureau managers to apply these guidelines to obtain maximum benefit from this relationship with tribal groups. We urge you to seek ways in which the guidelines can be used to accomplish the objectives of the consultation policy.
 
 
 40
 1. Consultation is intended to mean providing pertinent information to and obtaining the views of tribal governing bodies * * * .
 
 
 41
 2. The legal and regulatory framework within which the Bureau operates, including civil service rules, must be followed in applying these guidelines.
 
 
 42
 3. Within these guidelines, consultation with tribal groups will be encouraged. * * * Steps should be taken to apprise tribal groups of opportunities which exist as stated in these guidelines.
 
 
 43
 4. Because of the importance of clear understanding by all parties, agreements on the extent of consultation should be worked out. * * * When an agreement between a tribal group and a Bureau organization does provide for consultation on certain types of positions, care must be exercised to insure meaningful consultation consistent with management needs.
 
 
 44
 6. Tribal groups should be consulted on recommendations for selection of employees for certain positions.
 
 
 45
 a. Participation by tribal groups will be in an Advisory capacity. Recommendations will be encouraged and given full consideration, and tribal groups will be advised of action taken.
 
 
 46
 c. Normally, consultation will concern only the positions of Area Director, Agency Superintendent, and School Superintendent. * * * There may be circumstances when it is necessary to make personnel changes without consultation with the Tribe. In such a case management will advise the Tribe of the action and the reason.
 
 
 47
 7. Tribal groups should be encouraged to provide comments and recommendations on personnel policies, programs and procedures. * * * In responding to contributions made, tribal groups should be advised as to who has authority to take action on their recommendations and should be informed of the action ultimately taken. * * *8. Commensurate with the interests of tribal groups, they should be kept advised of significant circumstances affecting employees or overall staffing. This can include, but is not limited to, increases or decreases in staff or funds, reorganizations, and employee activities such as employee organizations and unions. * * *
 
 
 48
 9. Tribal groups should be encouraged to become acquainted with the duties and performance standards of employees, with classification standards and qualification standards governing positions, and with Bureau organization at pertinent facilities. Recommendations for change should be encouraged and considered, and responses should be provided to the recommending group.
 
 
 49
 10. Tribal groups should be encouraged to evaluate or participate in the evaluation of personnel management programs and practices. When Bureau officials plan evaluations, tribal groups should be invited to participate when appropriate. Examples of programs and practices which should be evaluated are: the effectiveness of the equal opportunity program, operation of the promotion program, success of recruitment efforts, ability of employees to relate to the needs of tribes, employee responsiveness and success in providing services, and the effectiveness of training programs. Findings and recommendations resulting from these evaluations should be carefully considered, and tribal groups advised of action to be taken.
 
 
 50
 The appellants contend that paragraph six of the guidelines, which provides that "(t)ribes should be consulted on recommendations for selection of employees" for the position of Agency Superintendent, required that the BIA solicit the views of the Tribe on the removal of Anthony Whirlwind Horse, and the policy decision behind that removal, prior to the time that the decision was made. They contend that such consultation was also required by paragraph eight of the guidelines, which provides that concerned tribal groups "should be kept advised of significant circumstances affecting employees * * * ".
 
 
 51
 The government does not argue that the Bureau is not bound by the consultation guidelines, or that the guidelines are not enforceable by the affected tribes or by the members of tribes. It argues only that the consultation requirements set forth in the guidelines do not apply to the particular agency action involved here. According to the government, paragraph six of the guidelines requires prior consultation with a tribe only for the initial selection of an agency superintendent, and not for his reassignment. No response to the asserted applicability of paragraph eight is made.
 
 
 52
 It is an established principle that an agency's interpretation of its own regulations is generally accorded great deference by a reviewing court. See United States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). This principle is not, however, absolute. A court need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the statute under which the regulations were promulgated, is plainly inconsistent with the wording of the regulation, or otherwise deprives affected parties of fair notice of the agency's intentions. See United States v. Larionoff, supra, 431 U.S. at 872-873, 97 S.Ct. 2150; Udall v. Tallman, Supra, 380 U.S. at 16-17, 85 S.Ct. 792; 4 K. Davis, Administrative Law Treatise § 30.12, at 260-261 (1958).
 
 
 53
 We believe that the Bureau's decision to remove Anthony Whirlwind Horse from the position of Agency Superintendent pursuant to a previously unannounced conflict-of-interest policy[13] contravenes both the letter and the spirit of the Bureau's consultation guidelines. Even if, as argued by the government, the sixth paragraph applies only to the initial selection of such an employee, the Bureau's action clearly falls within other sections. The implementation of such a policy is certainly a "significant circumstanc(e) affecting employees or overall staffing," as set forth in paragraph eight, of which the Tribe should have been previously advised. Assistant Secretary Gerard conceded at trial that this section might indeed have required prior consultation with the Tribe.[14] The Bureau's implementation of this policy without prior notice to and comment by the Tribe would also appear to contravene paragraph seven, which provides that "(t)ribal groups should be encouraged to provide comments and recommendations on personnel policies * * * and procedures," and paragraph nine, which provides that recommendations by tribal groups as to employee performance, classification and qualification standards are to be "encouraged and considered," with "responses * * * provided to the recommending group."
 
 
 54
 Indeed, the trial transcript is replete with testimony by Assistant Secretary Gerard that such consultation should have occurred:
 
 
 55
 First, from a broad policy standpoint, since assuming office a little over a year ago I believe the record will demonstrate (that) under my administration we try to follow what I would consider an enlightened policy of consultation with the tribes not only on personnel issues, but on a wide range of matter * * *.
 
 
 56
 Our whole effort to reorganize the Bureau and undertake management improvements to make it more responsive to the Indian people have been shared. All of the developments have been shared with the tribes both in writing and in a number of meetings with them.
 
 
 57
 With respect to reassignment, and while there is no formal policy, let me say here for the record (that) I would flatly consult with the tribe on this issue.
 
 
 58
 One of the unfortunate things that * * * happened is that the whole process got jerked out of kilter because of the pleas to the congressional delegation * * *.
 
 
 59
 What I hope(d) would have occurred would have been something along these lines: since the superintendents in all instances are under the jurisdiction of area directors, that this issue could have been discussed between the area director and the tribal governing body, but because * * * the direct appeals began coming to Washington * * * there was not as much discussion between the area and the local governing body as I would like to have seen occur.(W)hat we have in Indian affairs today * * * is a situation where we deal with tribes on a government-to-government basis. I am fairly committed to that process, and that implies a lot of things we discussed here today, appropriate consultation, and so on, which I think we all agree was taken out of kilter in this process.
 
 
 60
 Transcript of Trial at 180, 199, 201-202.[15]
 
 
 61
 The government contends that even if the Bureau's consultation policy was not followed, Assistant Secretary Gerard was aware of the Tribe's opposition to the removal of Anthony Whirlwind Horse by virtue of the resolutions to that effect which were passed by the Tribal Council, and by virtue of Gerard's meeting with delegations from the Tribal Council on May 10, 1978, and July 7, 1978. It contends that although Goodwin's initial decision to transfer Anthony Whirlwind Horse was made in early May, Gerard's personal decision to concur in that decision was not made until early August, after the Tribe's above-mentioned contacts with the Bureau had been made.
 
 
 62
 We do not believe that the two meetings of the tribal delegates with Washington officials fulfilled the requirement of "meaningful consultation" with tribal governing bodies as contemplated by the guidelines. By the time that the May 10th audience was granted, the decision to remove Anthony Whirlwind Horse had already been made. "Permitting the submission of views after (an administrative decision has been made) is no substitute for the right of interested persons to make their views known to the agency in time to influence the (administrative) process in a meaningful way." City of New York v. Diamond, 379 F.Supp. 503, 517 (S.D.N.Y.1974). See also Kelly v. United States Department of Interior, 339 F.Supp. 1095, 1101 (E.D.Cal.1972). Although Gerard agreed to reconsider the Bureau's decision at the meeting on July 7, 1978, it appears that this reconsideration consisted of a reconsideration of the factual situation presented by the holding of the positions by the Whirlwind Horse brothers,[16] and did not involve a reconsideration of the wisdom of the application of the Interior Department's conflict-of-interest policy to Indian employees of the BIA. Indeed, there was testimony at trial that the general conflict-of-interest policy adopted by the Department of the Interior required the removal of Anthony Whirlwind Horse because the assumption of the tribal presidency by Elijah Whirlwind Horse created a per se appearance of a conflict of interest without regard to the existence or nonexistence of any other variables.[17]
 
 
 63
 By holding that the Bureau failed to comply with its own procedures, we are not, as the government asserts, holding that the Oglala Sioux Tribe is entitled to a superintendent of its choice. We hold only that where the Bureau has established a policy requiring prior consultation with a tribe, and has thereby created a justified expectation on the part of the Indian people that they will be given a meaningful opportunity to express their views before Bureau policy is made, that opportunity must be afforded. Failure of the Bureau to make any real attempt to comply with its own policy of consultation not only violates those general principles which govern administrative decisionmaking, See United States v. Caceres, supra, 440 U.S. at 751 n. 14, 99 S.Ct. at 1471 n. 14, 59 L.Ed.2d at 743 n. 14, Citing Morton v. Ruiz, supra, 415 U.S. at 235, 94 S.Ct. 1055, but also violates " 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.' " Morton v. Ruiz, supra at 236, 94 S.Ct. at 1075, Quoting Seminole Nation v. United States, 316 U.S. 286, 296, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942).
 
 III.
 
 64
 The concern of the Oglala Sioux Nation over the Bureau's action was eloquently expressed in a statement to the District Court made by Enos Poorbear, a member of the Oglala Sioux Tribal Council:
 
 
 65
 THE WITNESS (Enos Poorbear): Your Honor, could I comment or is that not permissible?THE COURT: Counsel, he wants to make a statement. You may make inquiry to ask whether or not he has any further statement to make.
 
 
 66
 Q (By Mario Gonzalez, counsel for Anthony Whirlwind Horse): Mr. Poorbear, do you have any further statement to make to the Court?
 
 
 67
 A Yes, briefly, if I may.
 
 
 68
 I have been involved in tribal government for many, many years. I read and write my language.
 
 
 69
 I don't have to tell this Court of all the violence in the past on our reservation.
 
 
 70
 With Mr. Anthony Whirlwind Horse as our superintendent, (and) his brother, Mr. Elijah Whirlwind Horse, as our tribal president, people (have begun) to talk to each other. There are many, many Indian eyes on us waiting the outcome of this court here. * * *
 
 
 71
 Now, I am very, very much afraid and I have told this to Mr. Gerard and Mr. Goodwin I have had sons shot on the reservation, one through the forehead, friends lost, friends shot, but since these two brothers (have been) in as the head of the reservation, the Tribe and the Bureau, you don't read about all the violence that we had in the past.
 
 
 72
 I entertained a motion to the Council to retain our superintendent before this started, before Mr. Gerard, Mr. Goodwin and others started to move to take our good superintendent away. I worked with and on reservations not only on our reservation, but across reservations across the United States and I can truthfully say that Mr. Anthony Whirlwind Horse is the very best. The welcome mat is there at his office and his home. People go to his home at all hours of the night and he talks to them. I know and feel that he realizes that the individual, the Oglala Sioux problem may not seem big to him, but it is big to the individual, and he immediately tries to do something about it. He is an exception.
 
 
 73
 Thank you very much, Your Honor.
 
 
 74
 Transcript of Trial, at 69-71.
 
 
 75
 After this statement, the District Court stated that he "was most impressed by what Mr. Poorbear said." Transcript of Trial, at p. 72. We are as well.
 
 
 76
 The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Gerard also discussed the removal of Anthony Whirlwind Horse with representatives of the Oglala Sioux Tribal Council in September, 1978. This meeting was held in Rapid City, South Dakota, during a convention of the National Congress on American Indians. At trial, Gerard acknowledged that this meeting occurred after the final decision to transfer Whirlwind Horse had been made and, thus, had no role in the decisionmaking process
 
 
 [2]
 In an order issued on November 8, 1978, the District Court announced that it would not consider the second and third claims in the intervenor's amended complaint, which alleged a deprivation of property without substantive and procedural due process, because they were beyond the scope of the action brought by the Tribe. Anthony Whirlwind Horse does not appeal from this order
 The Superintendent's first claim alleged that the BIA's announcement of his transfer to third parties, including ex-President Trimble, violated the Privacy Act, 5 U.S.C. § 552a. After trial, the District Court concluded that this claim, even if proven, would not enable the Superintendent to resist his transfer and refused further consideration of this claim. Anthony Whirlwind Horse also does not appeal from this portion of the District Court's order.
 
 
 [3]
 These arguments, in substance, were that the Bureau's decision to transfer Anthony Whirlwind Horse was arbitrary, capricious and contrary to law because it was based on Civil Service statutes and regulations which are not applicable to Indian employees of the Department of the Interior, as set forth in § 12 of the Indian Reorganization Act of 1934, 25 U.S.C. § 472; that the transfer of Anthony Whirlwind Horse, without prior consultation with the Tribe, violated Article IV, Section 1(a) of the Oglala Sioux Tribal Constitution, by which the officials of the Department of the Interior are bound; and that the BIA's action in treating every sibling relationship between an agency superintendent and a tribal president as conclusively establishing an appearance of a conflict of interest under 43 C.F.R. § 20.735-32(d) denies Anthony Whirlwind Horse due process of law under the Fifth Amendment
 
 
 [4]
 The appellees filed a motion in this Court on April 18, 1979, requesting that this Court dissolve the injunction imposed by the District Court pending appeal. With our final resolution of this matter, this motion is now moot
 
 
 [5]
 The Supreme Court has also noted that an agency's violations of its own regulations "may well be inconsistent with the standards of agency action which the APA directs the courts to enforce." United States v. Caceres, 440 U.S. 741, 751, 99 S.Ct. 1465, 1473, 59 L.Ed.2d 733, 744 (1979) (footnote omitted)
 
 
 [6]
 The government also contended at oral argument that since Anthony Whirlwind Horse did not seek exemption from Civil Service requirements when he was hired, but instead received a "competitive" appointment, he cannot now seek any advantages available to Indian employees under § 12. This contention is without merit. Even if Anthony Whirlwind Horse met the Civil Service requirements which were in effect at the time of his appointment, and he thus did not need to avail himself of the exemptions provided in § 12, that does not mean that he cannot claim the benefits of that section now
 
 
 [7]
 During oral argument, the government also claimed the general authority of the Department of the Interior to promote, demote or reassign its employees as authority for the Bureau's action. No particular regulation setting forth this power, apart from the general Civil Service regulations applicable to all departments of the Executive Branch, was cited. It is well established that an agency's action must be upheld, if at all, on the basis that was articulated by the agency itself, and that it cannot be sustained on the basis of post-hoc rationalizations of appellate counsel. See FPC v. Texaco, Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); Tabor v. Joint Bd. for Enrollment of Actuaries, 185 U.S.App.D.C. 40, 44-45, 566 F.2d 705, 709-710 (1977); Office of Communication, Etc. v. F.C.C., 560 F.2d 529, 533 (2d Cir. 1977). We, therefore, do not consider this additional asserted authority in our review of the agency action before us
 
 
 [8]
 5 C.F.R. § 335.102 (1978) provides, in pertinent part:
 (A)n agency may:
 (a) Promote, demote, or reassign a career or career-conditional employee * * *.
 
 
 [9]
 43 C.F.R. § 20.735-32(d) provides, in pertinent part:
 (d) Actions to be avoided. An employee shall avoid any action, whether or not specifically prohibited by this subpart, which might result in, or create(s) the appearance of:
 (1) Using public office for private gain;
 (2) Giving preferential treatment to any person;
 (3) Impeding Government efficiency or economy;
 (4) Losing complete independence or impartiality;
 (5) Making a Government decision outside official channels; or
 (6) Affecting adversely the confidence of the public in the integrity of the Government.
 
 
 [10]
 The purpose of § 12 of the I.R.A. and its predecessors has been described by the Supreme Court as the "giv(ing) (to) Indians a greater participation in their own self-government; (the) further(ing) (of) the Government's trust obligation toward the Indian tribes; and (the) reduc(tion) (of) the negative effect of having non-Indians administer matters that affect Indian tribal life." Morton v. Mancari, 417 U.S. 535, 541-542, 94 S.Ct. 2474, 2478, 41 L.Ed.2d 290 (1974) (footnotes omitted)
 
 
 [11]
 Indeed, disqualification of otherwise highly qualified Indians from agency superintendencies because of familial ties to tribal officials would appear to have a potentially devastating effect on the ability of Indians to serve in this capacity on their own reservations, since the number of reservation Indians who would possess the skills necessary for such key positions within the BIA would probably be small, and the practice of marriage within tribal groups is apparently common. See, E. Maynard & G. Twiss, Hechel Lena Oyate Kin Nipi Kte, That These People May Live: Conditions Among the Oglala Sioux of the Pine Ridge Reservation, DHEW Pub. No. HSM 72-508 (1970) at p. 17
 
 
 [12]
 The Tribe claims that the failure of the BIA to consult with the Tribe prior to the time that the transfer decision was made also violates Article IV, Section 1(a), of the Oglala Sioux Tribal Constitution. We agree with the government that this section only describes the powers of the Oglala Sioux Tribal Council and does not impose any consultation requirement upon the BIA
 
 
 [13]
 The government concedes that the conflict-of-interest policy, which presumes that a conflict-of-interest situation exists when there is a sibling relationship between an agency superintendent and the president of the tribe on the reservation wherein that agency is located, was unannounced prior to its implementation in the case of the Whirlwind Horse brothers. Assistant Secretary Gerard testified that as of the time of trial, no written policy statement on this issue had been issued by the Bureau and that the only authority which the Bureau had for any action which it might take in such cases is 43 C.F.R. § 20.735-32(d), the general regulation which prohibits certain conduct by Interior Department employees which "might result in, or create the appearance of" favoritism or other partiality. This regulation does not, however, indicate that a familial relationship with another governmental official is to be considered a per se conflict of interest, and Gerard conceded at trial that this regulation by its terms applies to "conduct" by an employee, not the appearance of a conflict of interest created by the assumption of a particular governmental post by an employee's sibling, as is claimed here
 
 
 [14]
 This testimony was as follows:
 Q (By Marvin Amiotte, Attorney for the Oglala Sioux Tribe): I would like to go onto (sic) paragraph 8 of those same guidelines, then, and read you another couple of sentences here.
 "Commensurate with the interest of tribal groups, they should be kept advised of significant circumstances affecting employees or overall staffing. This can include but is not limited to increases or decreases in staff reorganization," and it goes on from there.
 Do you see that particular paragraph as being applicable in this particular situation?
 A (Assistant Secretary Gerard): Well, in retrospect, if we all had looked at that, yes, that might have been applicable to this situation.
 Transcript of Trial, at 223-224.
 
 
 [15]
 Gerard's intimation that the Tribe was responsible for the elevation of the decisionmaking process to the Washington level is unsupported by the record. The possibility of the creation of a conflict-of-interest situation by the election of Elijah Whirlwind Horse was first raised by Trimble in inquiries directed to the BIA's Washington office. The inquiry from a staff member of the Senate Select Committee on April 27, 1978, to the same office was also apparently in response to approaches made by Trimble to members of Congress. By the time that members of the Oglala Sioux Tribe attempted to meet with Washington officials, the decision to remove Anthony Whirlwind Horse had already been made by the Washington officials. Gerard conceded this point during cross-examination:
 Q (By Marvin Amiotte, counsel for the Tribe): I would like to go back to these two meetings before your September meeting with the tribal officials here in Rapid City * * *.
 The first meeting held in Washington, D. C., was held after Mr. Goodwin * * * had made a decision * * * that Anthony Whirlwind Horse would be reassigned, is that correct?
 A (By Forrest Gerard): That is correct.
 Q: * * * (T)he decision was first made at the Central Office in Washington, isn't that correct?
 A: Yes, namely because in my view the system had been thrown completely out of kilter with the appeal directly to Washington and to the Congressional delegations.
 Q: So the decision was instituted at the Washington level.
 Then, as I understand your testimony here today, it was thrown out of kilter because, then, we went immediately back to Washington?
 A: There were all kinds of communications prior even to the (Tribe's first) trip to Washington.
 I believe numerous telephone calls were being directed at my level, which in itself demonstrated to me that the Tribe desired to deal with it at that level rather than elsewhere.
 Q: Because that's where the decision had been made?
 A: That's true.
 Q: And the Area Office cannot overrule you, so there is no sense in going there * * *?
 A: That is correct.
 Transcript of Trial, at 217-220.
 
 
 [16]
 During direct examination, Assistant Secretary Gerard testified:
 Q (By Jeffrey Viken, attorney for the government): At (the meeting on July 7, 1978) you made the personal commitment that you would reconsider Mr. Goodwin's decision to reassign?
 A (By Gerard): Yes.
 Q: Did you personally reconsider?
 A: Yes, I did. * * *
 We took another look at the evidence that had been presented and I saw nothing from that meeting that altered the fact situation and, therefore, I made the decision in early August.
 Transcript of Trial, at 203.
 
 
 [17]
 THE COURT: * * * (I)n a case such as this, as we have here today with the two brothers, one the head of the tribe and the other in a superintendent's position with the BIA, * * * is that per se wrong according to your rules or does it depend upon variables?
 THE WITNESS (John Combs): In this situation where you have the one brother being the chief official of the tribe and the other official being the chief official of the Bureau, and given the regulations such as the one cited, (43 C.F.R. § 20.735-32(d)) particularly, I don't see how we could allow this situation anywhere.
 THE COURT: * * * (T)his is now a precedent and no brother or no sister can be in a like situation anywhere in the United States. * * * There are no variables. There are no other considerations. That's the sole reason. Isn't that right?
 Are there any other considerations that would stop this transfer? Is there anything else that you would consider to change your mind or your views about this transfer based upon the appearance of impropriety? * * *
 THE WITNESS: I can't think of one * * *.
 Transcript of Trial, at 129, 154-155.
 The lack of any meaningful hearing was recognized by the trial court:
 THE COURT: * * * I do have a curious interest in finding out what individuals do if they don't like what (the Bureau is) doing, if they don't think it is in the best interests of their tribe * * *.
 What recourse do they have to any hearing apparatus where they can voice their opinion?
 Is this only a dream that they have?
 Here these people have come into court because they can't apparently get anyone to listen to them. At least, there has been no hearing of any substance, at least, that I have heard of here. If there has been a hearing of * * * real substance, then I am not aware of it.
 Transcript of Trial, at 110-111.