**SOUTHLAND ROYALTY COMPANY,**
Plaintiff,

v.

**FEDERAL ENERGY ADMINISTRATION**
and John F. O'Leary, Administrator, Federal Energy Administration, Defendants.

Civ. A. No. 4–77–179K.

United States District Court,
N. D. Texas,
Fort Worth Division.

Aug. 11, 1980.

Vinson & Elkins, Henry S. May, Jr., Houston, Tex., for plaintiff.

Arthur Lowran, Regulatory Litigation Div., Washington, D. C., Kenneth J. Mighell, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION

BELEW, District Judge.

This is an action for a declaratory judgment and for injunctive relief to declare illegal and to enjoin and set aside certain actions of the defendants on the grounds that defendants' actions are unauthorized by and are in violation of the Emergency Petroleum Allocation Act of 1973 (EPAA), as amended, 15 U.S.C. §§ 751 et seq.; the Federal Energy Administration Act (FEAA), as amended, 15 U.S.C. §§ 761 et seq.; The Energy Conservation and Production Act (ECPA), Pub.L.No. 94–385, 90 Stat. 1125, The Administrative Procedure Act (APA), as amended, 5 U.S.C. §§ 551 et seq.; the regulations of defendants; and various substantive and procedural rights of plaintiff.

Both Southland and the FEA have moved for summary judgment as to the validity of subpart III(E) of Ruling 1977–2 issued by the FEA on January 19, 1977. As there is no genuine issue of material facts, it is proper to decide this case by summary judgment. See Sweet v. Childs, 507 F.2d 675, 680 (5th Cir. 1975), Dozier v. United States, 473 F.2d 866 (5th Cir. 1973).

Because of Ruling 1977–2 Plaintiffs allege Defendants are attempting to illegally restrict the scope of the statutory exemptions from Federal price controls of crude oil production from stripper well properties.

## JURISDICTION

Jurisdiction is founded on the following statutes: (a) The EPAA, 15 U.S.C. § 751, § 754(a)(1), as amended; (b) the FEAA, as amended, 15 U.S.C. § 761 et seq.; (c) the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note; (d) the EPCA 42 U.S.C. §§ 6201 et seq. and § 6393(b); and (e) the provisions of 28 U.S.C. §§ 1331, 1346, 1361, 2201 and 2202.

FEA Reg. § 205.154 provides that there is no administrative appeal of rulings issued by the FEA, and, therefore, the Plaintiff has no administrative remedy against Defendants' alleged unlawful acts and interpretation of the regulations.

### The Parties

Plaintiff Southland is a corporation engaged in the production of crude oil. Part of such production comes from marginal wells. These wells are known as stripper wells or stripper properties.

The defendants are the Department of Energy [1] (DOE) and its secretary James R.

---

1. On October 1, 1977, the Department of Energy ("DOE") succeeded to FEA's interests pursuant to the Department of Energy Organization Act ("DOEOA"), Pub.L.No. 95–91, 42 U.S.C. §§ 7101, et seq. Pursuant to Section 901 of the DOEOA, President Carter, on September 13, 1977, issued Executive Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977), which provided that the DOE would become effective on October 1, 1977. The DOE is responsible for enforcing the Mandatory Petroleum Pricing and Allocation Regulations, published at 10 C.F.R. Parts 211 and 212, which were formerly enforced by the FEA. For the sake of consistency, the Court will refer to the FEA throughout this brief, since the Ruling challenged herein was issued by the FEA.

Schlesinger, who is Administrator of the FEA and in that capacity has been delegated the powers and duties conferred upon the President and the FEA by the EPAA, the FEAA and the EPCA.

## STATUTES AND REGULATIONS

*The Origin Of The "Property" Concept: The Economic Stabilization Act of 1970*

Federal price control over domestic crude oil stemmed from the Stabilization Act of 1970, Pub.L.No. 91–379, 84 Stat. 796, and amendments thereto. Pursuant to the Act's broad authorization to stabilize prices, the Cost of Living Council (CLC) on August 19, 1973, issued the Phase IV Petroleum Price Regulations which regulated the prices of the first sales of all domestic crude oil.[2] CLC identified a "property" as the basic producing unit subject to price regulation and defined the term as coextensive with the boundaries of the land that the producer owned or leased and from which he produced crude oil:

> "Property" is the right which arises from a lease or from a fee interest to produce domestic crude petroleum.

38 Fed.Reg. 22, 538 (August 22, 1973); 6 C.F.R. § 150.354 (1973).

To implement the price controls, CLC required that the producer calculate a "base production control level" (BPCL) for each property, the BPCL equalling the amount of crude oil produced and sold from the property in the base year 1972. 38 Fed. Reg. at 22,538; 6 C.F.R. § 150.354(b) (1973).

The property's BPCL was the cornerstone of the Phase IV price regulations. A producer was required to compare the current volume of production from a property to its BPCL for the corresponding month in 1972. Current production volumes exceeding the BPCL could be sold at unregulated prices,[3]

while volumes falling below the BPCL were subject to a ceiling price. This so-called "two tier" price control system was thus designed to stabilize petroleum prices, yet give the producer financial incentive to increase production beyond 1972 levels.

### The Stripper Well Exemption

The stripper well exemption followed quickly on the heels of the CLC crude oil price regulations. Faced with an energy shortage made immediately serious by the October, 1973 Arab oil embargo, Congress enacted strong measures to increase the domestic crude supply. In Section 406 of the Trans-Alaska Pipeline Authorization Act (TAPAA), enacted on November 16, 1973, Congress freed from Phase IV price controls crude oil recovered from marginally-productive wells known as "stripper wells."

> The first sale of crude oil and natural gas liquids produced from any lease whose average daily production of such substances for the preceding calendar month does not exceed ten barrels per well shall not be subject to price restraints established pursuant to the Economic Stabilization Act of 1970, as amended, or to any allocation program for fuels or petroleum established pursuant to that Act or to any federal law for the allocation of fuels or petroleum.

Pub.L.No. 93–153, § 406, 87 Stat. 576 (1973).

As of January 1, 1973, there were 350,000 stripper wells in the United States. An individual stripper well was of limited significance, producing an average of only 3.6 barrels of crude oil per day. Together, however, they accounted for 70 percent of all oil wells and 12–15 percent of all domestic crude production in the United States. S.Conf.Rep.No. 1119, 94th Cong.2d Sess. 51,

---

**2.** *See* 38 Fed.Reg. 22,536 *et seq.*, (August 22, 1973) (to be codified in 6 C.F.R. Part 150, Subpart L).

**3.** The regulations also designated an amount of production equal to the amount of production in excess of the BPCL as "released" oil and allowed the "released" oil to be sold at unregulated prices. Thus, a producer got a double

benefit from increasing production because the effect of the regulation was to allow him to sell a volume of crude oil that equalled twice the increase in production at unregulated prices. This provision was also designed to provide the producer with a financial incentive to increase production. 38 Fed.Reg. 22,536 (August 22, 1973), 6 C.F.R. § 150.354(c).

§ 8 *reprinted in* [1976] U.S.Code Cong. & Ad.News 2027, 2034. Congress recognized the marginal nature of these wells and feared that federal price controls would force their premature shutdown for purely economic reasons. TAPAA's Conference Report stated:

> The purpose of exempting small stripper wells—wells whose average daily production does not exceed ten barrels per well—from the price restraints of the Economic Stabilization Act (now in Phase IV) and from any system of mandatory fuel allocation is to insure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shutdown of stripper wells for economic reasons.
>
> \* \* \* \* \* \*
>
> Many stripper wells are of only marginal economic value. When the costs of their operation exceed the value of their production, they are shut-in, and a known and developed crude oil reserve is lost to U.S. production. Removing Phase IV price restraints from these marginal stripper wells . . . will encourage owners and operators of stripper wells to maintain production and to keep these wells in operation for longer periods of time than would be possible if the value of their crude oil production were determined under Phase IV price ceilings. This increased incentive will, it is anticipated, permit stripper well operators to make new investments in the eligible wells and improve the gathering and other facilities for moving this oil to market.

Conf.Rep.No.624, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Ad. News 2417, 2523, 2531–32.

Congressional intent was thus two-fold. The increased value of stripper well crude oil would encourage producers: (1) to sustain production from their stripper wells for a period longer than would be economically feasible under existing price regulations; and, (2) to increase their production through workovers and enhanced recovery techniques.

CLC borrowed from existing price regulations in implementing the statutory stripper well exemption. Expressly incorporating the Phase IV "property" definition, CLC defined "stripper well lease" as:

> [A] "property" whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed ten barrels per day during the preceding calendar month.

38 Fed.Reg. 32,494–95 (November 26, 1973), 6 C.F.R. § 150.54(s) (1974).

Thus, CLC defined "stripper well lease" by use of a term, i. e., "property," defined elsewhere in the regulatory scheme. Any subsequent alteration in the "property" definition central to the two tier pricing system would necessarily affect the stripper well's exemption application.

### The Emergency Petroleum Allocation Act of 1973

On November 27, 1973, eleven days following TAPAA's enactment, Congress enacted the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L.No. 93–159, 87 Stat. 627 (now codified at 15 U.S.C. § 751 *et seq.* (1976).[4] The EPAA supplanted TAPAA's counterpart stripper well exemption with Section 4(e)(2)(A):

> The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

Thus, EPAA carried forward the stripper exemption, but amended the qualification period from one based on production during the preceding calendar *month* to production during the preceding calendar *year.* CLC

---

4. The general purpose of the EPAA was to provide authorization to the President to promulgate regulations providing for the allocation of crude oil, residual fuel oil, and each refined petroleum product, and to set prices for these products, in light of the shortages which existed at the time.

immediately implemented the congressional amendment with regulations retroactively effective to the date of EPAA's enactment. CLC's new regulations defined stripper well lease as a "property."

> ... whose average daily production of crude petroleum and petroleum condensates, including natural gas liquids, per well did not exceed 10 barrels per day during the preceding calendar year.

38 Fed.Reg. 34,465 (December 14, 1973); 6 C.F.R. § 150.54(s)(2) (1974). CLC left unchanged its regulation defining "property" which remained crucial to the application of the stripper well exemption.

With the enactment of EPAA, CLC lost its authority to set prices controlling domestic crude oil. By Executive Order No. 11,-748, 3 C.F.R. 376 (1974), the President created the Federal Energy Office (FEO) and delegated to it his authority to implement EPAA. On December 26, 1973, CLC delegated its petroleum pricing authority to FEO and on January 14, 1974, FEO adopted and reissued the existing definitions of "stripper well lease" and "property." 10 C.F.R. § 210.32(b) (1976).

### The Federal Energy Administration Act of 1974

With the enactment of the Federal Energy Administration Act of 1974, Pub.L.No. 93–275, 88 Stat. 96 (now codified at 15 U.S.C. § 761 et seq. (1976), and Executive Order No. 11,790, 3 C.F.R. 157 (1975), the Federal Energy Administration (FEA) gained authority to set prices of domestic crude oil. As did FEO, FEA adopted and reissued the existing regulatory definitions of "stripper well lease" and "property."

### "Once A Stripper, Always a Stripper"

Pursuant to formal rulemaking in early 1975, FEA amended its regulation defining "stripper well lease," altering the qualification period from "the preceding calendar year" to "any preceding calendar year beginning after December 31, 1972." 40 Fed. Reg. 22,123 (May 21, 1975). FEA explained that this so-called "once a stripper, always a stripper" rule would remove the regula-

tion's disincentive for the producer to increase production from his marginal wells:

> FEA proposed the amendment in order to remove a disincentive to increased production from such marginally-producing stripper well leases that exists under the current regulation. Because the current regulation affords an exemption only in the year following a calendar year in which production from the lease was at or below the statutory stripper well level of ten barrels or less per well per day, there exists no incentive for producers to increase production levels above the ten barrel per well per day limit, either through work-overs or enhanced recovery techniques, because such increased per-well production for a calendar year would then result in a loss of the stripper well lease exemption in the following year.

40 Fed.Reg. 22,123 (May 21, 1975). FEA learned through industry comments that many marginal properties had not been upgraded by enhanced recovery projects because of the prospective loss of the exemption. For legitimate economic reasons, many operators of stripper well properties had failed to take steps that could provide an additional source of domestic crude oil. Consequently, FEA determined:

> [T]he amendment should be modified so as to provide that once a property has qualified for the exemption on the basis of its per well production for any calendar year commencing after December 31, 1972, the property will retain the exemption notwithstanding increased production from the lease above the stripper well limit in a subsequent year.

> \* \* \* \* \* \*

> [T]his amendment ... is designed to encourage the increased domestic production of crude oil from marginally producing stripper well leases, and thereby more adequately ... carry out the intent of the congressionally-mandated stripper well lease exemption.... Continuation of the regulation in its present form ... would effectively eliminate this potential source of additional domestic crude oil, and would tend to accelerate the decline

in production from marginally-producing properties.

40 Fed.Reg. at 22,123–24. Accordingly, following formal rulemaking procedures, FEA amended its definitions of "stripper well lease" to read:

A "property" whose average daily production of crude oil, including condensates, per well did not exceed 10 barrels per day during any preceding calendar year beginning after December 31, 1972.

40 Fed.Reg. at 22,124; 10 C.F.R. § 210.32(b) (1976).

*The Energy Policy and Conservation Act: Repeal of the Stripper Well Exemption and FEA's Redefinition of "Property"*

On December 22, 1975, Congress enacted the Energy Policy and Conservation Act (EPCA) (now codified at 42 U.S.C. § 6201 *et seq.* (1977), 15 U.S.C. § 753 *et seq.* (1976), which imposed mandatory price controls on domestic crude oil for 40 months and repealed the stripper well exemption beginning February 1, 1976. The EPCA required all domestic production after February 1, 1976 to be sold at a weighted average price not exceeding $7.66 per barrel.[5] Congress suggested, however, that the President set a separate, higher ceiling price for stripper well production to give producers adequate financial incentive to sustain production from marginal wells.

Pursuant to EPCA's mandate, the FEA proposed regulations creating two classifications of crude oil—"old" oil which would be sold at a "lower tier" price of approximately $5.25 per barrel and "new" oil which would be sold at an "upper tier" price of approximately $11.28 per barrel. Stripper well crude oil was classified as "new" oil. *See*, 41 Fed.Reg. 1,564 (January 8, 1976).

In the same rulemaking proceeding, the FEA also announced that, in response to numerous comments from concerned parties, it was considering correcting a long standing irrationality in its regulations by amending the "property" definition to recognize as a separate property each reservoir underlying the surface boundaries of a lease or fee interest. Under the "property" definition which existed, a producer was required to combine all production from all reservoirs underlying a "property" in determining whether any oil would qualify as "new" oil or "stripper crude oil." In many instances, this requirement to combine all production resulted in no incentive to develop new reservoirs underlying a property.[6]

The final regulations implementing the statutory requirements of EPCA classified crude oil produced from a "stripper well lease" as "new" oil. A "stripper well lease" was defined as:

. . . a property whose average daily production of crude oil (excluding condensate recovered in non-associated production) per well did not exceed 10 barrels per day during any preceding calendar year beginning after December 31, 1972.

41 Fed.Reg. 4,940 (February 3, 1976); 10 C.F.R. § 212.74(c)(1) (1976).

The FEA chose, however, not to adopt the proposed amendment to the *"property"* definition because "it is not possible at this time to evaluate with any degree of certainty the effect on the proportions of old, new and stripper well lease crude oil that would occur from such a change in the basic definition." *Id.* at 4,938.

On April 13, 1976, FEA again gave Notice of a Proposed Rulemaking to include separate and distinct producing reservoirs within in the "property" definition. The Notice did not specifically mention the amendment's potential effect on the stripper well exemption. It merely recognized that the agency had earlier declined to adopt the proposed definition for the reason referenced above. 41 Fed.Reg. 16,179 (April 16, 1976).

---

**5.** The Act contained provisions which would allow the weighted average price to rise ten percent each year during the period of controls.

**6.** Declining production from existing reservoirs, when combined with new production, often resulted in no net production gain, therefore depriving the new production of qualification for upper tier prices.

Immediately thereafter and before the public hearing on the "property" amendment, FEA gave Notice of an additional rulemaking to adopt five amendments to the stripper well exemption. One of five proposed amendments was to alter the stripper well lease qualification period from "any preceding *calendar year* beginning after December 31, 1972," to "any consecutive *twelve-month period* beginning after December 31, 1972."

The existing regulation's requirement of a calendar year test period often required leases to produce at marginal levels for a period longer than twelve months before qualifying for stripper treatment. FEA disapproved of the existing qualification period because it might:

> [R]esult in less production from such marginal properties than would occur if a different measuring period were used. This is because there are likely to be some cases where a producer might postpone efforts to increase production from a property until it has qualified as a stripper well lease. In some cases, this might be as long as twenty-three months.

41 Fed.Reg. 18,875 (May 7, 1976). At the same time, FEA also proposed that stripper well crude be sold at market prices in order to prevent the premature shut-down of stripper production because of price controls.

*The Energy Conservation And Production Act: Congress Again Exempts Stripper Well Production From Federal Price Controls*

On August 14, 1976, Congress enacted the Energy Conservation and Production Act (ECPA) (now codified at 42 U.S.C. § 6801 *et seq.* (1977) and 15 U.S.C. § 761 *et seq.* (Supp.1978)). Section 121 reinstated a statutory exemption for stripper well production from federal price controls.[7]

The statutory exemption adopted "property" as the basic producing unit that could qualify for stripper treatment. In addition, Congress broadened the exemption by adopting FEA's proposed amendment to alter the "property's" qualification period from "any preceding calendar year beginning after December 31, 1972" to "any consecutive twelve-month period beginning after December 31, 1972." For the first time Congress also adopted in the statutory exemption the "once a stripper, always a stripper" concept. Moreover, Congress expressly delegated to the President the authority to define terms in Section 121 consistent with statutory purpose and confirmed its intent that the stripper well exemption give producers adequate financial incentive to sustain and increase production from marginally profitable wells. *See,* 3 U.S.Code Cong. & Ad.News 2034 (1976).

On August 20, 1976, FEA officially adopted the amended "property" definition allowing each separate and distinct reservoir underlying a lease or a fee interest to be treated as a separate property. Effective September 1, 1976, FEA defined "property" as:

> . . . [T]he right to produce domestic crude oil, which arises from a lease or a fee interest. A producer may treat as a separate property each separate and distinct producing reservoir subject to the same right to produce crude oil, provided that such reservoir is recognized by the

7. The exemption reads as follows:

(i)(1) The first sale price of stripper well crude oil shall be exempt from the regulation promulgated under section 753 of this title [price controls] as amended pursuant to the requirements of this section. . . .

(2) For the purposes of this subsection *"stripper well crude oil" means crude oil produced and sold from a property whose maximum average daily production of crude oil per well during any consecutive 12-month period beginning after December 31, 1972, does not exceed 10 barrels.*

(3) To qualify for the exemption under this subsection, a property must be producing crude oil at the maximum feasible rate throughout the 12-month qualifying period and in accordance with recognized conservation practices.

(4) The President may define terms used in this subsection consistent with the purposes thereof.

15 U.S.C. § 757(i) (Supp.1978) (emphasis added).

appropriate governmental regulatory authority as a producing formation that is separate and distinct from, and not in communication with, any other producing formation.

41 Fed.Reg. 36,184 (August 26, 1976); 10 C.F.R. § 212.72 (1976). At the same time, FEA redefined "stripper well lease" as "stripper well property:"

"[S]tripper well property" means a property whose average daily production of crude oil (excluding condensate recovered in non-associated production) per well did not exceed 10 barrels per day during any preceding consecutive calendar year beginning after December 31, 1972.

10 C.F.R. § 212.74(c)(i) (1976).

The basis and purpose statement accompanying the amended regulation did not specifically discuss the new "property" definition's effect upon the stripper well exemption, noting only that:

Volumes of "old," "new," "released," and "stripper well lease" crude oil are a function of the scope of the "property" as determined by the producer.

41 Fed.Reg. at 36,175. The statement nonetheless clearly implied that a reservoir, newly-designated as a "property," could immediately qualify for stripper treatment based upon the prior production levels of such separate reservoir, See 41 Fed.Reg. at 36,179.

### The Controversy

On September 1, 1976, Gulf Oil Corporation, as the operator of certain Southland properties, classified various producing reservoirs belonging to Southland as separate properties. Where a reservoir was classified as a stripper well property, Southland began to receive the exempt price allowed. Additionally, Southland undertook workover and other production enhancement operations on certain wells, increasing the production of some reservoirs to a level of greater than ten barrels per day per well.

The reservoirs that Gulf Oil Company designated as "properties" as of September

1, 1976 had a demonstrated ten barrel or less production record per well per day for a period of 12 consecutive months after December 31, 1972 and prior to September 1, 1976. Southland contends that as the reservoirs had a proven marginal production capability for a consecutive 12 month period prior to September 1, 1976, they should be entitled to stripper well status for these properties as of September 1, 1976. Under the FEA's position taken in Ruling 1977–2, any qualification period for a newly designated property must begin on the date of reclassification, on or after September 1, 1976. The position undertaken by FEA Ruling 1977–2 would not allow Southland to obtain stripper well status for its reservoirs until September 1, 1977 at the earliest. If the interpretation of the FEA as set out in Ruling 1977–2 is correct, Southland will face (1) a loss of stripper well status for the period September 1, 1976 to September 1, 1977; the original 12 month qualifying period and (2) a loss of stripper well status for an additional indefinite period of time on any reservoirs that were reworked and exhibited production above the ten barrel per well per day limit on the reservoir. In this event, Southland will not be entitled to stripper well status until the production level of these reservoirs falls to ten barrels or less for a 12 month period.

### FEA Ruling 1977–2

On January 19, 1977, FEA issued the "interpretative ruling" that is the subject of this suit.[8] FEA announced that a producer could not classify production from a separate and distinct producing reservoir as "stripper well crude oil" until that reservoir sustained a *prospective* twelve-month period of marginal production commencing at the date of its designation as a "property," a date in no event earlier than September 1, 1976. Such a prospective qualification period was required by FEA even though the property had produced at marginal levels for twelve consecutive months or longer preceding its new designation and such production could be conclusively demonstrated

8. Ruling 1977–2 is reproduced as Appendix A to this opinion.

by records filed with state regulatory agencies.

As a consequence of FEA Ruling 1977–2's "interpretation" of the September 1, 1976 amendment, certification and sale of "stripper well crude production" from newly-designated "properties" was rendered illegal until September 1, 1977, at the earliest, with severe criminal and civil sanctions for violation.

### Question Presented

Do separate reservoirs, newly designated as properties, having the requisite history of marginal production prior to such designation, qualify as stripper well property if that reservoir whose average daily production did not exceed 10 barrels per well per day during any consecutive twelve month period beginning after December 12, 1972, or must such property sustain a prospective twelve month period of production after its designation from and after September 1, 1976.

In order to answer this question, the Court must determine if Ruling 1977–2 is substantively invalid because it is contrary to the plain meaning of the statutory stripper well exemption and the implementing regulations, particularly those of August 20, 1976, and/or whether it is procedurally invalid in that it was issued in derogation of the notice and comment requirements of both the Administrative Procedure Act (5 U.S.C. § 553(b), (d), and the Federal Energy Administration Act (15 U.S.C. § 766(i)).

### Discussion

Plaintiff has attacked Ruling 1977–2 on three alternative grounds. First, Plaintiff contends that the ruling is substantively invalid because it is "arbitrary, capricious, and an abuse of discretion or otherwise not in accordance with law." Plaintiff's Brief in Support of Motion for Summary Judgment p. 83. Southland contends that the regulation in question is invalid because it bears no reasonable relation to the purpose of Energy Conservation Production Act and it shows a failure on the part of Defendant to consider all relevant factors prior to its

promulgation. *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Defendant has not directly answered this portion of Plaintiff's argument.

Plaintiff's second attack on 1977–2 is procedural in nature. Southland asserts that Ruling 1977–2 was issued in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1977), ("APA"). The APA provides in part:

> (b) General notice of proposed rulemaking shall be published in the Federal Register unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include:
>
> (1) [A] statement of the time, place, and nature of public rulemaking proceedings;
>
> (2) reference to the legal authority under which the rule is proposed; and,
>
> (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.
>
> (d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date....

5 U.S.C.A. § 553(b), (d) (1977). The act further provides that, except in the case of certain types of agency actions, such an interpretive ruling, 5 U.S.C.A. § 553(b)(A), the agency must allow interested parties to participate in the rule-making process through the submission of briefs written data or oral arguments. 5 U.S.C. § 553(c).

It is uncontested that the FEA did not follow the procedures set out above prior to the issuance of 1977–2. Southland argues that such failure to comply with the APA invalidates the rule. The substantial impact that 1977–2 has had on the industry is indicative, according to Plaintiff, of the substantive nature of the rule, thus taking it out from under the "interpretive rule" exception to the notice and comment procedures required by the APA. *See Energy Reserves Group Inc. v. Federal Energy Ad-*

**445**

*ministration,* 447 F.Supp. 1135 (D.C.Kansas 1978).

Defendant rebuts this argument on several grounds. First, the DOE asserts that 1977–2 is an interpretive rule which interprets and clarifies the two stripper well regulations which are the subject of this lawsuit. Defendant asserts that, because 1977–2 is an interpretive rule, it comes under the statutory exception to notice and comment procedure. 5 U.S.C. § 553(b)(A). The DOE's second response to Plaintiff's procedural objections rebuts Plaintiff's contention that if a ruling, whether "legislative" or "interpretive," has a substantial impact on the regulated industry, the notice and comment procedures must be followed. Finally, the DOE asserts that Congress intended for the APA's "interpretive" ruling exemption to remain in effect for rulings issued under the Federal Energy Administration Act.

Plaintiff's third objection to Ruling 1977–2 is that it violates the plain meaning of the relevant regulatory language. Because the Court feels that Southland's arguments on this point are well taken, it is not necessary for the Court to fully address the substantive and procedural objections briefly outlined above and this Court expressly declines to do so.

Because this Court is of the opinion that Ruling 1977–2 contradicts the plain meaning of the relevant statute and regulations, and because it is also the opinion of this Court that the ruling contravenes the express congressional policies underlying the relevant legislation, this Court finds that Ruling 1977–2 is plainly and clearly erroneous and is therefore invalid.

### Standard of Review

The parties ask this Court to pass on the validity of Part III(E) Ruling 1977–2 (1977–2). Southland alleges that 1977–2 misinterprets or contradicts the plain meaning of a statutory definition and two federal regulations, 15 U.S.C. § 757(i)(2) (Supp.1980); 10 C.F.R. § 212.54(c) (1976); and 10 C.F.R. § 212.72 (1976), respectively. The statutory provision and 10 C.F.R. § 212.64(c) are sub-

stantially similar definitions of the term "stripper well property." The Government takes the position that 1977–2 is a reasonable interpretation of the relevant statutory and regulatory language and that, because the judicial review that this Court may apply to an administrative action such as the ruling in question essentially a reasonableness test, this Court is precluded from substituting its judgment for that of the agency. For the following reasons, this Court feels that Defendant is incorrect with regard to both the reasonableness of its interpretation of the regulations cited above and the standard of review available to the Court.

■ As a general rule, the judiciary may not fully review agency actions.

[W]hen construing an administrative regulation, a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.

*Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945), *quoted in Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 276, 89 S.Ct. 518, 523, 21 L.Ed.2d 474, 481 (1969). Thus, in the usual case, agency interpretations of their own regulations are not to be second-guessed by the judiciary. Review is not foreclosed, however. Courts are free to make an independent inquiry into the correctness of administrative interpretations of statutes or rules, although the agency's position is generally accorded great deference. *Guardian Federal Savings & Loan v. Federal Savings & Loan Insurance Corp.,* 589 F.2d 658 (D.C. Cir. 1978).

■ Review of agency constructions of a statute involve a related, though slightly different standard.

The construction put on a statute by the agency charged with administering it is entitled to deference by the Courts, and ordinarily that construction will be af-

firmed if it has a 'reasonable basis in law.' *NLRB v. Hearst Publications,* 322 U.S. 111, 131 [64 S.Ct. 851, 860, 88 L.Ed. 1170]; *Unemployment Commission v. Aragon,* 329 U.S. 143, 153–154 [67 S.Ct. 245, 250, 91 L.Ed. 136]. But the courts are the final authorities on issues of statutory construction. *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 385 [85 S.Ct. 1035, 1042, 13 L.Ed.2d 904], and 'are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. *NLRB v. Brown,* 380 U.S. 278, 291 [85 S.Ct. 980, 988, 13 L.Ed.2d 839]; *Volkswagenwerk v. FMC,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968). *Securities and Exchange Commission v. Sloan,* 436 U.S. 103, 118, 119, 98 S.Ct. 1702, 1711, 1712, 56 L.Ed.2d 148, 161 (1978) (inserts in original). See also *Usery v. First National Bank of Arizona,* 586 F.2d 107 (9th Cir. 1978). This judicial restraint is to be exercised once a finding of reasonableness is made, the reviewing court must uphold the regulation or statutory interpretation, even though it is not the only rational interpretation or the statutory construction is not the one the reviewing court would have made had it been considering the question de novo. *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Fredericks v. Kreps,* 578 F.2d 555 (5th Cir. 1978).

■ Regulatory discretion or rule making authority, however, must be exercised within certain parameters and it is the duty of the judiciary to see that those limits are not exceeded.

The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is . . . [only] the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute is a nullity.

*Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528, 531 (1936). *See also United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48, 56 (1977); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1978); *N. L. R. B. v. Brown,* supra. If an agency is powerless to create regulations which conflict with Congressional intent, then it follows that an agency is equally powerless to interpret an existing regulation in such a way as to cause consequences inconsistent with the purpose of the enabling act, and that any such interpretation is also a nullity. See, *e. g., Federal Maritime Comm. v. Seatrain Line,* 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973); *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707 (8th Cir. 1979).

It is therefore the task of this Court to evaluate the intent of Congress as expressed in the Energy Conservation and Production Act (ECPA), 42 U.S.C. § 6801 *et seq.* (1977) and 15 U.S.C. § 761 *et seq.* (Supp.1980) and the other relevant statutes to determine whether Ruling 1977–2 operates to frustrate congressional policy. If it does not, then this Court must uphold Ruling 1977–2 as a valid exercise of regulatory discretion. If, on the other hand, this inquiry leads to the conclusion that 1977–2 fails to implement the Congressional mandate, then it is a nullity and must be declared invalid.

### Congressional Policy

■ Even a cursory examination of the legislative background of the instant controversy reveals an unbroken string of pronouncements and enactments in favor of (1) keeping existing marginal wells in production and (2) encouraging producers to take steps to increase production past the ten barrel per well per day stripper well limit.

As both parties have indicated in their briefs, the concept of exempting stripper well production from price controls over oil and gas which was first adopted in the Economic Stabilization Act of 1970, Pub.L. No.91–379, 84 Stat. 796 and amendments, originated in the Trans-Alaska Pipeline Authorization Act, Pub.L.No.93–153, 87 Stat.

576 (1973) (TAPAA). Section 406 of that statute provided that marginal wells were to be freed from price controls based on a historical production average for the entire lease less than ten barrels per well per day for the preceding calendar month. Congress specifically addressed the reasons for the exemption.

> The purpose of exempting small stripper wells ... from the price restraints of the Economic Stabilization Act.... and from any system of mandatory fuel allocation is to ensure that direct or indirect price ceilings do not have the effect of resulting in any loss of domestic crude oil production from the premature shut down of stripper wells for economic reasons.

2 U.S.Code Cong. & Admin.News 2523, 2531 (1973). Acknowledging the importance of the total domestic production from stripper wells and recognizing that, under the price controls, many such marginal wells were being permanently shut in for legitimate economic reasons, the Congress expressed the expectation that freedom from price controls would serve to keep such wells in operation longer than would be the case were the wells to continue to be subject to price regulations. *Id.* at 2532. The increased financial incentive was expected to "permit stripper well operators *to make new investments in the eligible wells* and improve the gathering and other facilities for moving this oil to market." *Id.* (emphasis added)

Congress cautioned against any abuses of the exemption, providing that it be strictly construed and authorizing on site inspections to insure compliance. The administering agency was directed to use State production records and to prohibit "gerrymandering" of lease units to average down high production wells with low production wells to create exempt properties. *Id.* Finally, Congress reiterated that the only purpose of the stripper exemption was to keep stripper wells in operation. *Id.* Shortly after the TAPAA was enacted, the cost of living Council enacted regulations to carry out the Congressional mandate. *See* 38 Fed.Reg. 32,494–95 (November 26, 1973), 6 C.F.R. § 150.54(5) (1974).

It is apparent from the language quoted above that Congress meant to encourage production from stripper wells. It is also obvious from the record that Congress meant for the exemption to be available immediately to qualifying properties. The statement concerning the use of state production records to certify stripper properties strongly suggests that stripper status was to be immediately available to those wells or properties whose production histories showed to be eligible. Congress did not address the issue more directly, presumably, because of the fact that the qualification period was only one month.

Defendant asserts that the language in the U.S.Code Cong. & Admin.News concerning gerrymandering indicates that Congress did not want to encourage the generation of new stripper properties. This Court feels that the conclusion that the Department of Energy wishes to draw from that language does not follow and is therefore incorrect.

At the time of the enactment of the TAPAA, the basic production unit for the purposes of the price regulations was the property. The Cost of Living Council had defined a property as a "right which arises from a lease or from a fee interest to produce domestic crude petroleum." 38 Fed. Reg. 22,538 (August 22, 1973); 6 C.F.R. § 150.354 (1973). Under that definition, a property was coextensive with the boundaries of a leasehold, and the boundary of a property could be moved simply by amending language in the lease document itself. It would be a simple matter, under those circumstances, to carve out groups of individual wells which qualified as stripper and include them in a lease to the exclusion of non-stripper wells and create an exemption where none existed before. Although it is unclear to this Court why that result was deemed undesirable by Congress, it expressed a desire that such practices be prohibited. That concern, however, is simply irrelevant to the facts in the instant case.

Validly promulgated FEA regulations allow producers to designate separate reser-

voirs as properties. To the extent that a particular producing reservoir is not coextensive with the boundaries of a lease, any redesignation of a reservoir as a property where it was previously part of a larger property is technically a gerrymander, as that term was referred to by Congress. Such a reclassification could serve to legitimately create a stripper property where one did not previously exist, and it would do so regardless of whether the twelve month stripper qualification period was applied prospectively or retroactively. Congress' concern in 1973, thus appears irrelevant to today's facts.

There is, however, a more fundamental flaw with Defendants' argument on this point. The term to "gerrymander" is defined as meaning "to divide (a territorial unit) ... in an unnatural ... way." Webster's New International Dictionary 952 (3d ed. 1976). As long as the size and boundaries of a "property" depended on leasehold language, the possibility of unnatural division of a territorial unit existed. Once a property becomes redesignated under the regulations as a reservoir, however, the possibility of a gerrymander ceases to exist. Producing reservoirs have ascertainable geological limits. Defendants have failed to show, and this Court cannot conceive of how someone could gerrymander a geological fact. As a technical matter, the old definition created gerrymandered properties, dividing up territorial areas in units that had artificially imposed boundaries.

In sum, Defendant is correct that Congress was, at one time concerned about the possibility that leases might be manipulated to create stripper properties. This Court is of the opinion, however, that that concern is no longer relevant and that in any event, it in no way supports Defendants' assertion that Ruling 1977–2 is consistent with congressional policy.

The next legislative enactment dealing with the stripper well exemption was the Emergency Petroleum Allocation Act of 1973, Pub.L.No.93–159, 87 Stat. 627, codified at 15 U.S.C. § 751 *et seq.* (1976) (EPAA). Section 4(e) of that act exempted oil from stripper properties from the mandatory allocation program adopted in other sections of the EPAA. Section 4(e)(2)(A) of the EPAA redefined stripper property to require that average production rate of less than 10 barrels per well per day be proven for the preceding calendar year before the property could qualify as a stripper.

The Congress exempted stripper crude from the allocation program "in the belief that pricing controls and forced allocation of stripper oil would necessarily inhibit production.... Proponents of the limitation point out that pricing restrictions imposed under other Federal authority have demonstrably had the effect of inhibiting production from such wells." 2 U.S.Code Cong. & Admin.News 2582, 2598 (1973). An additional policy of Congress, virtually contemporaneous with the policy behind the stripper exemption in the TAPAA, was thus explicitly adopted. Congress desired to encourage continued production from stripper wells.

Shortly after the enactment of the EPAA, the Cost of Living Council enacted retroactive regulations adopting the calendar year stripper well qualification period called for in § 4(e)(2)(A) of the EPAA. 38 Fed.Reg. 34,465 (December 14, 1973); 6 C.F.R. § 150.54(5)(2) (1979). The definition of the term "property" was left unchanged. The Federal Energy Office (FEO) took over the Cost of Living Council's energy related functions soon thereafter, and the definitions in question were reissued, 10 C.F.R. § 210.32(b) (1976).

The Federal Energy Administration Act of 1974, Pub.L.No.93–275, 88 Stat. 96, 15 U.S.C. § 761 *et seq.* (1976) replaced the FEO with the Federal Energy Administration (FEA). The FEA reissued all of the relevant definitions involved here. It also adopted the "once a stripper, always a stripper" concept consistent with the previously verbalized Congressional policy in favor of encouraging production from stripper wells.

While under the Energy Policy and Conservation Act, 42 U.S.C. § 6201 *et seq.* (1977) the FEA adopted the definition of property currently before this Court, 41

Fed.Reg. 36,184 (August 26, 1976); 10 C.F.R. § 212.72 (1976). At the same time, however, the FEA amended the definition of stripper property to provide that any consecutive twelve-month period after December 31, 1972, could serve to qualify a property as a stripper. 10 C.F.R. § 212.-74(c)(i) (1976). The latter amendment was made because, under the old qualification period, producers might have to wait as long as twenty-three months to qualify a property. This was a result which was perceived to be contrary to the congressional policy in favor of increased production from stripper properties. 41 Fed.Reg. 18,875 (May 7, 1976).

The last legislative attention paid to this matter was in the Energy Conservation and Production Act, 42 U.S.C. § 6801 *et seq.* (1977) and 15 U.S.C. § 761 *et seq.* (Supp. 1980) (ECPA). In that statute Congress reinstituted the stripper exemption which had been repealed by the Energy Policy and Conservation Act, *supra.* Section 121 of the ECPA defined stripper well crude oil as coming from a property whose production was less than ten barrels per well per day during *any* consecutive twelve-month period beginning after December 31, 1972. Congress thus explicitly adopted the once a stripper always a stripper concept, further supporting Plaintiff's argument that Congress intended to encourage increased stripper production. 15 U.S.C. § 757(i)(2) (Supp. 1980) The EPCA also gave the President the authority to make definitions and regulations consistent with Congressional policies in favor of financial incentives to preserve and rework stripper wells. *See* 3 U.S.Code Cong. & Admin.News 2034 (1976).

It is plain, from the foregoing discussion, that Congress has exhibited two policies with regard to the stripper exemption. *First*, Congress sought to provide incentive to keep as many marginal wells as possible producing for as long as it remained feasible. *Second*, Congress wished to provide economic justification for the utilization of work-over techniques on marginal wells to enhance production. These two legislative goals have been in existence virtually since the inception of price controls on oil and gas

and they have been consistently adopted and adhered to both by Congress and by the various regulatory bodies without exception to the present. Ruling 1977–2 is the only regulatory act brought to this Court's attention that has conflicted with that trend.

Ruling 1977–2 frustrates both of the Congressional policies detailed above. Congress has recognized that stripper well operators are largely small and independent producers. 3 U.S.Code Cong. & Admin.News 2034 (1976). The requirement that newly designated properties go through a new, twelve month qualification period places a financial burden on those producers, most of whom operate on very thin margins. Twelve months of operation at a loss might be exceedingly difficult for a small businessman to manage. Similarly, prospective qualification period operates as a temporary disincentive for the use of recovery techniques, which, in turn, delays the increased production desired by Congress. Because Ruling 1977–2 flies in the face of Congressional intent and purpose, this Court is compelled to declare it invalid.

The effect of Ruling 1977–2 insofar as it delays enhanced production techniques circumvents Congressional intent to increase overall production in another way. An old property, with stripper and non-stripper wells averaged in to prevent the property from qualifying as stripper, might not be potentially lucrative enough to justify the added expense of increasing production on the stripper wells because the whole property is non-stripper and would continue to be ineligible for the exemption. If, on the other hand, the old property was split into two reservoir properties, one stripper, the other non-stripper, then it would immediately become financially feasible for funds to be spent on enhancing production from the stripper property, thereby raising the total production from the lease, if the exemption was immediately available.

Defendant argues that, because a separate *property* reservoir could not have been designated a property before September 1, 1976, that reservoir's easily ascertainable

production could not be used as the EPCA states it should be, namely to qualify that newly designated property as a stripper. Although this position has more merit than most of the points raised by the Defendant, an examination of analogous Congressional enactments shows it to be incorrect. As noted earlier, the stripper exemption in the TAPAA was given immediate effect and the Cost of Living Council was directed by Congress, to look to the state production records to determine eligibility for the exemption. 2 U.S.Code Cong. & Admin.News 2531 (1973). Second, the FEA itself in connection with the property redefinition in question, looked to historical production rates for several purposes. When the definition was adopted, the pricing scheme promulgated in the Energy Policy and Conservation Act, *supra*, ("Energy Act") was still in effect. Under the "two tier" system found in the Energy Act, each reservoir was required to have a Base Price Control Level (BPCL), a figure representing the volume of production for that particular property at a point in time in 1972. Whether a property qualified for upper or lower tier prices depended on how its current production compared with its BPCL. When the FEA declared that separate reservoirs could be deemed as properties, a question immediately arose concerning the value of the BPCL's for the newly designated properties. As a solution to the problem the FEA directed producers to calculate BPCLs for their separate reservoir properties based on the reservoirs' production history prior to its redesignation as a property.

Thus, under a set of circumstances virtually indistinguishable from the instant case, the FEA reached the opposite conclusion regarding the usefulness of production records. Such inconsistency especially on the face of strong Congressional policy, is inexplicable, and it serves to discredit defendants argument on this point. The fact that reservoirs were not properties prior to September 1, 1976, does not appear to have concerned the FEA or its successor, the DOE in other contexts, so this Court sees no reason why that fact should be of importance in this case.

Having found that Ruling 1977–2 operates in a manner out of harmony with Congressional intent, this Court has no choice but to declare it invalid. As stated before, an administrative agency's power is to create regulations that implement the will of Congress. Any regulation that operates to frustrate a Congressional mandate is a nullity. If a regulation which, on its face, clearly comports with Congressional intent, is interpreted in such a way so as to conflict with that intent, the interpretation must be held to be invalid, and this Court so holds with regard to Ruling 1977–2.

As further support for this result, the Court finds that the regulation is clear on its face and not in need of administrative interpretation. The language of the two regulations in question clearly allows immediate certification of newly designated properties as strippers, if the production history so allows. Defendant even agrees that the literal meaning of the regulations is that production of ten barrels or less per well per day during any twelve month period after December 31, 1972 is sufficient to satisfy the requirement. If the administrator had wished to engraft the requirement of a prospective qualification period for newly designated properties onto the regulation, he could have done so explicitly. The regulations as written, however, permit no such reading. *See Standard Oil Co. v. Department of Energy*, 596 F.2d 1029 (Em. App.1978); *United States v. Chicago Blackhawk Hockey Team, Inc.*, 468 F.2d 221 (Em. App.1972); *Sampson v. Clark*, 162 F.2d 730 (Em.App.1947).

Interpretations of regulations inconsistent with their plain meaning have been ruled invalid in other contexts. In *Frederick County Fruit Growers Assoc. v. Marshall*, 436 F.Supp. 218 (D.C.W.D.Va.1977) the Court reached that result. In that case, the Secretary of Labor sought to interpret a regulation stating that fruit growers must pay the transportation costs of imported workers so as to require that the payment be made in advance instead of as a reimbursement. The court held that the "Secretary's interpretation of the regula-

tion in question is inconsistent with the plain meaning of the regulation and cannot, therefore, be upheld." *Id.* at 225.

### Conclusion

For the reasons discussed above, this Court is of the opinion that Part III(E) of Ruling 1977–2 is substantively invalid. This holding is based on the fact that Ruling 1977–2 interprets regulations 10 C.F.R. § 212.54(c) (1976) and 10 C.F.R. § 212.72 (1976) so as to cause them to operate in a manner that frustrates the DOE's statutory mandate and the intent of Congress. *See, SEC v. Sloan, supra; NLRB v. Brown, supra; Federal Maritime Comm. v. Seatrain Line, supra; Oglala Sioux Tribe of Indians v. Andrus, supra.*

Second, it is the opinion of this Court that Part III(E) of Ruling 1977–2 contradicts the plain meaning of the regulations cited above and the relevant portions of the ECPA and that it is invalid for that reason.

Because this Court has invalidated Part III(E) of Ruling 1977–2 on Substantive grounds, it is not necessary to address any of the other points raised by the parties, and the Court hereby expressly declines to do so.[9]

For the reasons stated above, this Court is of the opinion that Part III(E) of Ruling 1977–2 is invalid. It is therefore ORDERED that Plaintiff's Motion for Summary Judgment be and is hereby GRANTED and that Defendant's Motion for Summary Judgment be and is hereby OVERRULED.

The parties shall bear their own costs.

### APPENDIX A

*FEA Ruling 1977–2 Part III. E.*

E. *Treatment of separate reservoirs as stripper well properties*

Effective September 1, 1976, prices charged in the first sale of crude oil produced and sold from a stripper well property are exempt from the price regula-

tions applicable to first sales of domestic crude oil. A "stripper well property" is defined in 10 CFR 212.54 as

> a "property" whose average daily production of crude oil (excluding condensate recovered in non-associated production) per well did not exceed 10 barrels per day during any preceding consecutive 12-month period beginning after December 31, 1972.

Section 212.54 was adopted by FEA on October 29, 1976 (41 FR 40319, November 3, 1976) to implement the congressional policy, set forth in the Energy Conservation and Production Act ("ECPA," Pub.L. 94–385), of promoting continued production of crude oil from marginal properties. In this regard, FEA indicated in the October 29 Notice that

> as evidenced in the ECPA legislative history, the Congress has intended to *prolong* the production of crude oil from properties that produce 10 barrels per well per day or less, and *not to generate development of new stripper well properties.* (Emphasis added, 41 FR at 48321.)

Accordingly, FEA made it clear that newly-developed properties must establish a 12-month history of marginal production *before* they may be treated as stripper well properties.

FEA believes that the same policy is appropriately applied to newly-*designated* properties, whose property status is predicated upon a reclassification, on or after September 1, 1976, by the producer.

The September 1 amendment to the definition of property was designed to ensure that the incentives intended under the two tier price system would be maximized over the remainder of the term of crude oil price controls mandated by EPCA. Accordingly, the option to treat separate reservoirs as separate properties is intended to provide producers with additional incentives, through additional

---

**9.** See *Marathon Oil Company v. Federal Energy Administration, et al.,* Civil Action File No. 77–232 in the United States District Court for the Northern District of Ohio, Western Division, wherein Part III(E) of FEA Ruling 1977–2 was held procedurally invalid because it violated the notice provision of Section 553(b) of the Administrative Procedure Act.

452

revenues, to increase production, and not to promote property reclassifications solely to achieve stripper well property status.

To the extent that an individual reservoir-property sustains production levels of 10 barrels or less per well per day for a period of 12 consecutive months after being designated a property, that reservoir-property would, of course, qualify as a stripper well property.

42 Fed.Reg. 4409, January 25, 1977; reprinted in 3 *CCH Energy Management* ¶ 16,066, at p. 16,200.

