# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3510

_____

Marilyn B. Dionne,               *
                                         *

         Appellant,          *

                                         *    Appeal from the United States
       v.                       *    District Court for the
                                         *    District of North Dakota.
Donna E. Shalala, Secretary, U. S.   *
Department of Health and Human    *
Services,                          *
                                         *

         Appellee.           *

_____

Submitted:  November 17, 1999
Filed:  April 5, 2000

_____

Before WOLLMAN, Chief Judge, LAY, and BOWMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.

       Marilyn Dionne filed this Title VII action alleging race and national origin discrimination in the assignment of her classification grade as a public health nurse with the Indian Health Service, an agency of the Department of Health and Human Services. The District Court[1] granted the Secretary's motion for summary judgment. We affirm.

I.

_____

[1] The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

Most employment within the federal government, including that at issue in this case, is classified under the General Schedule established by 5 U.S.C. §§ 5101-5115 (1994). Positions are classified according to their difficulty and level of responsibility, and pay rates are set accordingly. For example, grade GS-1 positions, which currently pay an annual salary of up to $20,000, are characterized by the "simplest routine work" under "immediate supervision, with little or no latitude for the exercise of independent judgment," while GS-15 positions, which currently pay an annual salary of up to $117,000, are characterized by "work of outstanding difficulty and responsibility." 5 U.S.C. § 5104.

In this case, Dionne, a member of the Turtle Mountain Band of Chippewa, started work in May 1991 as a GS-7 clinical nurse for the Belcourt Hospital of the Indian Health Service. After a year, Dionne advanced to grade GS-9. In September 1992, Dionne applied for a public health nurse position within Belcourt Hospital. She apparently was the only applicant for the job, and her application was referred to Delbert Haskell, a personnel staffing specialist for the Indian Health Service. Mr. Haskell considered her education, experience, and prior federal government employment and concluded that she only was qualified to be referred for a GS-7 public health nurse position. Under the qualification standards that Mr. Haskell used to grade Dionne's application, positions at GS-9 and above required that one year of professional nursing experience must be sufficiently related to public health nursing in both subject matter and grade level. Mr. Haskell believed that Dionne's experience as a clinical nurse did not satisfy that standard. Accordingly, Dionne's application was referred at the GS-7 level, and she became a GS-7 public health nurse in June 1993. Dionne need not have accepted the transfer to the GS-7 position (she could have opted to remain a GS-9 clinical nurse); she voluntarily accepted the GS-7 position because of her interest in working in the public health field.

Approximately a year later, Susan Kartes, a non-Indian, was hired as a public heath nurse at Belcourt Hospital. Dionne soon learned that Kartes was hired for a GS-11 position. Dionne thought they had equivalent experience and believed she had been discriminated against when placed in the GS-7 position.[2] Dionne filed a complaint with the Equal Employment Opportunity Counselor at Belcourt and later filed a charge of race and national origin discrimination with the Equal Employment Opportunity Commission. The Secretary denied her claims, and Dionne brought suit in the District Court.

## II.

Dionne brought this case as a Title VII action. Accordingly, at the District Court, the case was analyzed under the familiar burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. On summary judgment, the District Court found that Dionne established a prima facie case of disparate treatment, but concluded that the Secretary articulated a nondiscriminatory reason for the grading decision—that Dionne was not qualified for the GS-9 or GS-11 positions. On appeal, Dionne in essence claims that the Secretary applied the wrong qualification standards in grading her public health nurse application. Instead of applying standards specially formulated for Indian applicants as required by the Indian Preference Act, 25

---

[2] Although the duties of the GS-7, GS-9, and GS-11 public health nurse positions appear to be the same at Belcourt Hospital for all practical purposes, the positions technically have different job descriptions with varying levels of responsibility. See App. at 35-44.

U.S.C. § 472 (1994),[3] Dionne alleges the Secretary applied the general civil service qualification standards then known as X-118 standards.[4]

The Indian Preference Act provides:

> The Secretary of the Interior is directed to establish standards of health, age, character, experience, knowledge, and ability for Indians who may be appointed[, without regard to civil-service laws,] to the various positions maintained, now or hereafter, by the Indian Office, in the administration of functions or services affecting any Indian tribe. Such qualified Indians shall hereafter have the preference to appointment to vacancies in any such position.

25 U.S.C. § 472 (1994); see also Preston v. Heckler, 734 F.2d 1359, 1367-69 (9th Cir. 1984) (holding that Office of Law Revision Counsel erred in omitting as obsolete phrase "without regard to civil-service laws" from codification of Indian Preference Act); Oglala Sioux, 603 F.2d at 715 (quoting Indian Preference Act in full and relying

---

[3] For the first time on appeal, Dionne seems to argue that the alleged Indian Preference Act violation constituted an independent claim. We decline to view Dionne's complaint as alleging anything other than a Title VII violation. Dionne's complaint does not mention the Indian Preference Act nor does it seek administrative review of an agency decision as was sought for an alleged Indian Preference Act violation in Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707 (8th Cir. 1979). Furthermore, the District Court only discussed the Indian Preference Act in the context of its discussion of evidence of pretext.

[4] While the record is not a model of clarity on this point, we believe that Dionne is correct on this point. Mr. Haskell's affidavit refers to qualification standards for general scheduled positions. And, in response to whether he applied "any special standards that were different from civil service that were meant to reflect her Indian background," Mr. Haskell stated, "No." App. at 54-55.

on phrase "without regard to civil-service laws" in reaching decision).[5]  The Indian Preference Act does more than simply require preference in employment decisions for qualified Indian applicants; it "requires the Secretary to establish separate standards for evaluating the qualifications of Indians for employment in the Indian Health Service." Preston, 734 F.2d at 1369-70 (rejecting argument that "the Act only requires that Indians be given preference in hiring when they are equally or more qualified than non-Indian applicants").  While Preston was decided by the Ninth Circuit and thus is not binding on us, the Secretary has undertaken to comply with its mandate to establish separate standards for Indian applicants.  Furthermore, in Oglala Sioux, on which Preston relies, we held that the Indian Preference Act forbids the "blind transference of general Civil Service principles."  Oglala Sioux, 603 F.2d at 716 (holding that general civil service conflict-of-interest regulation did not apply to tribal member).

Although Preston and Oglala Sioux forbid the "blind transference" of civil service standards, those decisions emphasized that the general civil service standards nevertheless may have significant bearing on the appropriate standards for Indian applicants:

> If, after giving full weight to the unique experience and background of Indians, as required by statute, the Secretary concludes that the only proper qualifications for a particular position are those that have already been adopted as a part of the civil service regulations, her separate and independent adoption of the same standards would not be unlawful.

Preston, 734 F.2d at 1372; accord Oglala Sioux, 603 F.2d at 716-17.  As in Preston, we are mindful that the Secretary must adopt standards that recognize "the strong

---

[5] Despite contrary indications from two courts of appeals, the 1994 version of the United States Code still omits as obsolete "without regard to civil-service laws" from the codified version of the Indian Preference Act.

federal policy of ensuring that health services provided to Indians are of the highest quality." Preston, 734 F.2d at 1371-72.

After the Ninth Circuit's decision in Preston, the Secretary established a steering committee to review the qualification standards in the Indian Health Service and to recommend qualification standards for Indian preference applicants. See Plan for the Review of Qualification Standards for Indians in the Excepted Service in the Indian Health Service, 49 Fed. Reg. 37,474 (1984). Among the steering committee's first actions was to identify a limited number of occupations for a pilot study. Public health nursing, also known as community health nursing, was among those occupations selected. In December 1986, the Secretary transmitted new qualification standards for Indian preference applicants to those occupations in the pilot study, including public health nurse positions. See Indian Health Service, Excepted Service Qualification Standards for Community Health Nurse Positions, Transmittal Sheet No. 1 (1986). These new qualification standards for Indian preference applicants to public health nurse positions are self contained and make no explicit reference to the X-118 standards. Six years later, in December 1992, the Secretary gave notice that the Indian Health Service "intends to adopt the [U.S. Office of Personnel Management] qualification standards (X-118 standards) for all personnel series not yet covered by excepted service standards published for Indian applicants." Plan for the Completion of the Review of Qualification Standards for Indians in the Excepted Service, 57 Fed. Reg. 57,070 (1992).[6] Because public health nurse positions were covered by new

_____

[6] In addition, the Secretary provided for the use of two selective factors or quality ranking factors for Indian applicants: "[a]bility to speak and interpret the language of the Native American population to be served" and "[k]nowledge of the culture, customs, and beliefs of the Native American population to be served." 57 Fed. Reg. at 57,071. As we understand these terms, selective factors are qualification standards that an agency may use in deciding whether applicants are basically qualified for a position. On the other hand, an agency must use the X-118 standards in deciding whether applicants are basically qualified for a position. Agencies use quality ranking

-6-

qualification standards for Indian preference applicants—namely, the December 1986 transmittal—the December 1992 notice and thus the X-118 standards have no bearing on this case.

Unfortunately, the District Court was unaware of the new qualification standards contained in the December 1986 transmittal.[7] The District Court, citing the December 1992 notice, concluded that the Secretary correctly applied the X-118 standards to Dionne's application. On this point, the District Court erred as a matter of law, inasmuch as the X-118 standards were not the standards the Secretary should have applied.

But, as the District Court correctly pointed out, Dionne's rebuttal to the Secretary's nondiscriminatory reason that she was not qualified must satisfy a two part test: "[P]laintiff can avoid summary judgment only if the evidence considered in its entirety (1) creates a fact issue as to whether the employer's proffered reasons are

---

factors to distinguish between qualified applicants. For example, all else being equal, an applicant who could speak and interpret the language of the Native American population to be served would rank higher than an applicant who could not.

[7] The parties are responsible for this omission. Apparently, neither party brought either the December 1986 transmittal or the December 1992 notice to the attention of the District Court. The court found the December 1992 notice on its own. That no one seemed to fully understand the complex administrative history of these qualification standards, together with the unusual procedural circumstances of the summary judgment order, which we need not describe, somewhat mitigate their failure to bring the December 1986 transmittal to the attention of the District Court. In any case, we treat Dionne's motion to supplement the record to include the December 1986 transmittal as a filing under Rule 28(j) of the Federal Rules of Appellate Procedure, and we take judicial notice of it. We note that on appeal the Secretary admits that the standards contained in the December 1986 transmittal applied to Indian applicants during the period when Dionne's application for a public health nurse position was pending.

pretextual and (2) creates a reasonable inference that [race] was a determinative factor in the adverse employment decision." Rothmeier v. Investment Advisers, Inc., 85 F.3d 1328, 1336-37 (8th Cir. 1996) (reconciling this Court's decisions after St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993)). "[T]he overall strength of [the] evidence must be sufficient for a reasonable factfinder to infer that the employer's decision was motivated by discriminatory animus." Id. at 1336.

Dionne's only evidence of intentional discrimination is that three other Native American nurses also accepted lower grade positions in their transfer from clinical nursing to public health nursing and that the service unit director's only explanation for her grade was "Because that's the way it is." App. at 28. We conclude, as the District Court did, that this evidence is insufficient as a matter of law to create a reasonable inference that intentional discrimination was a factor in the grading decision.

We are left only with evidence that the Secretary applied the wrong standards to Dionne's application. In other words, Dionne only has evidence that the Secretary's nondiscriminatory reason that she was not qualified was based on the Secretary's application of the X-118 standards rather than the Indian Preference Act standards as established in the December 1986 transmittal. There is absolutely no evidence that the application of the wrong standards was anything but an honest mistake.[8] The

---

[8] Judge Lay's dissent characterizes the inadvertent application of the wrong standards as "unlawful." There is, of course, a sense in which that is true. In a case brought pursuant to the Administrative Procedure Act seeking review of the Secretary's decision, Dionne might well prevail on the theory that, since the wrong standards were applied, the decision was "not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). But this is a disparate-treatment Title VII case, and to win such a Title VII case a plaintiff must be able to show that the employer intentionally discriminated against the plaintiff on account of race, color, religion, sex, or national origin. Much like the example in Hazen Paper Co. v. Biggins, 507 U.S. 604, 612 (1993), in which racial discrimination was described as an "improper" reason under Title VII, but not under the Age Discrimination in Employment Act, the Secretary's use here of the wrong

Secretary's stated reason for the GS-7 classification of Dionne was, in fact, the Secretary's actual reason. We do not believe this evidence can show pretext or still less that it can give rise to a reasonable inference of intentional discrimination. Without more, the evidence only shows that the Secretary applied the wrong standards in the context of a complex administrative system—a system so complex that even the parties to this lawsuit failed to bring the December 1986 transmittal to the attention of the District Court. That the December 1986 transmittal standards should have been applied because Dionne is a tribal member does not make the Secretary's inadvertent failure to do so somehow based on race or national origin. The Supreme Court has held that the application of Indian preference does not constitute invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment. See Morton v. Mancari, 417 U.S. 535, 551-55 (1974).[9] Dionne cannot have it both ways; the Secretary's mistaken failure to apply the standards also does not amount to discrimination. Of course, it is possible that a failure to apply the Indian preference standards could be motivated by discriminatory animus. But here, we simply have no evidence that was the case. Without such evidence, Dionne's Title VII claim must fail. Accordingly, we affirm the judgment of the District Court.

---

standards was improper under the qualification standards promulgated by the agency in accordance with the Indian Preference Act, but not under Title VII. On the record before us, the application of the wrong standards was merely inadvertent and simply a mistake of law. Accordingly, it is not evidence of an intent to discriminate.

[9] The Indian Preference Act is not an antidiscrimination law. "Rather, it is an employment criterion reasonably designed to further the cause of Indian self-government and to make the [Bureau of Indian Affairs] more responsive to the needs of its constituent groups. It is directed to participation by the governed in the governing agency." Morton, 417 U.S. at 554.

LAY, Circuit Judge, Dissenting.

I respectfully submit that the majority's affirmance of the district court's grant of summary judgment in favor of the Secretary of the Department of Health and Human Services ("Secretary") is egregiously wrong. It is in direct opposition to the law announced by the Supreme Court of the United States.

This court cautioned in 1979 that the IPA forbids the "blind transference of general Civil Service principles" to Indian hiring. Oglala Sioux Tribe of Indians v. Andrus, 603 F.2d 707, 716 (8th Cir. 1979). Only five years later, the Ninth Circuit stated that the IPA "requires the Secretary to adopt separate and independent standards for evaluating the qualifications of Indians for employment in the Indian Health Services . . . ." Preston v. Heckler, 734 F.2d 1359, 1371 (9th Cir. 1984). Additionally, the Preston court emphasized that "positions in the Indian Health Service are exempt from the civil service standards." Id. at 1372. In 1986, responding to Preston, the Secretary promulgated the Indian Health Service's Qualification Standards for Excepted Service ("1986 standards"). These standards expressly establish separate criteria for the employment of Indians in certain excepted service positions, including that of public health/community health nurse. Further, the 1986 standards preempt the general civil service qualification standards, known as the X-118 standards. At the time of Marilyn Dionne's application for the public health nurse position, the 1986 standards were in effect and her application should have been evaluated under these standards, as well as the IPA.

Notwithstanding these legal precedents and the Secretary's own 1986 standards, the Secretary unlawfully and deliberately applied the general civil service standards to Dionne's application. In so doing, the Secretary determined that Dionne was only qualified for a GS-7 position because, under the general civil service standards, she lacked the required year of specialized service in public health nursing. Thus, in order

to transfer into the new position and further her work within her tribal community, Dionne was required to accept a pay scale demotion.[10]

Today's majority opinion compounds the Secretary's unlawful action. The majority acknowledges that the Secretary's use of the general civil service standards was <u>unlawful</u>; nevertheless, it accepts inadvertence as an excuse for such action and concludes that the Secretary's conduct was "an honest mistake" rather than a subterfuge for discrimination. The majority's reasoning is flawed.

A. <u>Legitimate, Nondiscriminatory Reason</u>

In Title VII cases, after a plaintiff establishes a prima facie case of discrimination,[11] the burden of production shifts to the employer to articulate a "<u>legitimate</u>, nondiscriminatory reason" for the employment action. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973) (emphasis added). Under this analysis, once a prima facie case is established, a presumption arises that the employer unlawfully discriminated against the employee. <u>See</u> <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 254 (1981). If the employer fails to rebut the presumption by meeting its burden, the plaintiff is entitled to judgment as a matter of law. <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993).

---

[10]The Secretary's grading decision was made despite Dionne's extensive nursing background. At the time of her transfer, Dionne was licensed as a registered nurse by the State of North Dakota, had years of experience in specialized services working as a clinical nurse at Belcourt Hospital, and had been promoted from a GS-7 to a GS-9 in that position. Significantly, her prior work consisted of extensive and diverse experience within her tribal community.

[11]The district court held, and the majority accepts, that Dionne established a prima facie case.

In Burdine, the Supreme Court stated, "the employee's prima facie case of discrimination will be rebutted if the employer articulates <u>lawful</u> reasons for the action . . . ." Burdine, 450 U.S. at 257 (emphasis added). Additionally, Black's Law Dictionary defines the adjective "legitimate" as "[c]omplying with the law; lawful." BLACK'S LAW DICTIONARY 912 (7th ed. 1999). Thus, by usage and definition, an unlawful or illegal ground cannot serve to satisfy an employer's burden of articulating a "<u>legitimate</u>, nondiscriminatory reason."[12] In this matter, after Dionne established her prima facie case, the Secretary's proffered "legitimate, nondiscriminatory reason" for its action rested solely on the conclusion that she was not qualified for a higher grade under the general civil service qualification standards. The majority now concedes that the Secretary acted unlawfully in applying these standards; yet it allows such illegality to stand. Such a conclusion belies logic.

Additionally, the majority's opinion overlooks what is perhaps the best known legal maxim – "ignorance of the law is no excuse." While this maxim is one of general applicability, it must be applied more acutely to those who are presumed to know the law and are trusted to apply it. See Screws v. United States, 325 U.S. 91, 129 (1945) (Rutledge, J. concurring) ("[Ignorance of the law] is less an excuse for [individuals] whose special duty is to apply it, and therefore to know and observe it."). In this case, the Secretary was charged by Congress to promulgate specific employment standards

---

[12]This discussion of the inherent failure of unlawful reasons should not be taken out of context. In Hazen Paper Co. v. Biggins, 507 U.S. 604, 612 (1993), the Supreme Court stated "it cannot be true that an employer who fires an older black worker because the worker is black thereby violates the ADEA. The employee's race is an improper reason, but it is improper under Title VII, not the ADEA." Thus, the Court has noted that articulation of an illegal but true reason, unrelated to the claim at issue, may satisfy an employer's burden. However, the discussion in Hazen stands in contrast to the instant facts. Here the articulated reason was lack of qualification under the X-118 standards. The very application of such standards directly violates laws designed to give preferential treatment to Native Americans in employment. Such illegality is intricately related to the Title VII claim at stake.

for Indians, which it did. The Secretary then failed to apply its own standards in the present case. If the time-tested maxim is to retain any vitality, it minimally must mean that knowledge of the IPA and of one's own promulgated standards is to be imputed to the Secretary. Once such knowledge is properly attributed, it necessarily follows that the Secretary deliberately chose to ignore the law and applied unlawful criteria to Dionne's application. Professing ignorance does not transform such a choice into inadvertence or an innocent mistake, and to allow such is to invert the legal maxim.

On the record before us, the Secretary failed to articulate a legitimate, nondiscriminatory reason for the employment decision; thus, Dionne's prima facie case and its corresponding presumption remain un-rebutted. Consequently, the district court should have granted judgment as a matter of law in favor of Dionne. In failing to do so, the district court, and now this court, permit a governmental agency to escape liability under Title VII by pleading ignorance of its own rules, legislation, and of anti-discrimination laws. The IPA and the 1986 standards were designed to overcome the historically recognized negative effects of non-Indian control of Indian affairs and to facilitate the return of control to Indians. Title VII was designed, in part, to remedy race and national origin discrimination in employment. Today's holding undermines each of these objectives by simultaneously acknowledging the applicability of the laws and standards while excusing their violation because of alleged ignorance. Such strained analysis surely must fail.

B. Pretext

Notwithstanding the above discussion, the majority accepts the Secretary's assertion of Dionne's lack of qualification as a legitimate, nondiscriminatory reason and proceeds to analyze whether Dionne proved pretext under the third prong of McDonnell Douglas. Although I disagree for the reasons previously stated, for purposes of discussion I will assume that an unlawful, nondiscriminatory reason can suffice to carry the employer's burden in a pretext case.

Here, the Secretary's asserted nondiscriminatory reason was lack of qualification; it is undisputed, however, that the Secretary used unlawful standards in determining Dionne's qualifications. Consequently, the alleged nondiscriminatory reason serves as evidence of pretext because the reason given was false and could not be the true reason for her lack of promotion.

As the Supreme Court observed in Hicks:

> (1) the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason," and (2) "it is not enough . . . to *dis*believe the employer." Even though (as we say here) rejection of the defendant's proffered reasons is enough at law to *sustain* a finding of discrimination, *there must be a finding of discrimination*.

Hicks, 509 U.S. at 511 n.4 (emphasis in original) (internal citations omitted).

The majority concedes in the closing lines of its opinion: "it is possible that a failure to apply the Indian preference standards could be motivated by discriminatory animus." This being so, the Secretary's motivation or intent is a question for the jury to decide. As it stands, two reasonable inferences can be drawn from the evidence: (1) the Secretary's misapplication of the law was inadvertent or a mistake; or (2) the Secretary's misapplication was motivated by discriminatory animus.

At the very least, the plaintiff has demonstrated, and this court now agrees, that the employer's articulated reason was not the true reason and the trier of fact should then determine whether a mistake or discriminatory animus motivated the Secretary's action. This is the typical pretext case. It seems highly plausible that plaintiff's counsel, through effective cross-examination of the Secretary, could expose the incredulity of a high ranking government official's claim that he or she was not aware of the applicable laws or standards, and that failure to apply them was merely a good faith mistake. As the Burdine Court noted, "there may be some cases where the

-14-

plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." <u>Burdine</u>, 450 U.S. at 255 n.10.

Under these circumstances, even if one assumes this is a pretext case, the inferences to be drawn from the Secretary's claim should be drawn by a trier of fact and not the court. In all of the precedents of this court as well as those of the United States Supreme Court, where the employer's articulated reason is shown to not be the true reason, then pretext is deemed to have been shown and the trier of fact must be given the opportunity to infer whether the given reason hides intentional discrimination. Therefore, I conclude, even under a pretext analysis, this case should not have been dismissed at the summary judgment stage.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.